ANDERSON   *v.*   PACIFIC   COAST   STEAMSHIP
COMPANY, CLAIMANT OF THE STEAMSHIP
"QUEEN." ·

JORDAN *v.* PACIFIC COAST COMPANY, CLAIM-
ANT OF THE STEAMSHIP "UMATILLA," ETC.'

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR
THE NINTH CIRCUIT.

Nos. 641,.642.' Argued February 21, 1912.—Decided May 27, 1912.

When the Federal Constitution was adopted each State had its own
   pilotage regulations.
State pilotage laws are regulations of· commerce, but they fall within
   that class of powers which may be exercised by the States until
   Congress shall see fit to act.
The provisions of former Federal statutes relating to pilotage were
   incorporated in §§ 4401 and 4444, Rev. Stat., which are still in force.
In adopting the Revised Statutes change of arrangement from earlier

statutes will not be regarded as altering their scope and purpose; an intent of Congress to change the effect of prior law will not be presumed unless clearly expressed.

Distinctions between registered and enrolled vessels and history of statutes relating to state pilotage of registered and coastwise vessels reviewed and *held* that:

Coastwise sea-going vessels sailing under register and having officers with Federal pilot's licenses are not free from liability for pilotage fees under state laws, by virtue of § 51 of the act of February 28, 1871, 16 Stat. 440, c. 100, as reënacted in §§ 4401 and 4444, Rev. Stat.

There are no provisions in Title 52 of the Revised Statutes which may be construed as exempting coastwise sea-going vessels sailing under register, whose officers have Federal pilot's licenses, from liability for pilotage fees under state laws, under the rule of construction laid down in the last sentence of § 51 of the act of February 28, 1871.

Congress did not intend to classify with the coastwise vessels referred to in the last proviso of § 51 of the act of February 28, 1781, as reënacted in § 4444, Rev. Stat., registered steam vessels engaged in commerce with both foreign and domestic ports on the same voyage.

The wisdom of establishing Federal rules as to port pilotage for such registered vessels now exempted is a question for Congress to determine.

In this case *held* that American registered steam vessels sailing from San Francisco clearing for final destination to American ports and return, but stopping at foreign ports en route for less than ten per cent of the traffic, are subject on entering and leaving the port of San Francisco to the state pilotage laws of California as contained in §§ 2468, 2466 and 2432 of the Political Code of that State.

THE certificate in these cases is as follows:

"The libels in the above cases involve the question of power of a State to make pilotage regulations for certain classes of registered sea going steam vessels when entering and leaving harbors within the confines of the State.

"The steamers 'Queen' and 'Umatilla' were regularly sailing under register and were either on a voyage from the port of San Francisco in the State of California to a United States port on Puget Sound or from a United

States port on Puget Sound to said port of San Francisco, but in either such case said vessels did while en route between said ports of the United States stop at the port of Victoria, B. C., to and from which port of Victoria she did then carry and did then and there deliver and receive both passengers, mail and freight. Both vessels sailed direct to Victoria from San Francisco and direct to San Francisco from Victoria. At least ninety (90) per cent of passengers and cargo was carried between the United States ports and the parties stipulated that the voyage for which the vessels cleared was beween Puget Sound ports of the United States and San Francisco, with the right to stop and trade en route at Victoria. The stop at Victoria on each occasion was for about an hour. The officers of each vessel had federal pilot's licenses and each vessel was in fact piloted in entering and leaving the port of San Francisco by such an officer. Each of the vessels was tendered pilotage services—the 'Umatilla' on leaving port and the 'Queen' on entering—by a resident bar pilot of the port of San Francisco, duly commissioned, and acting under the law of the State of California. In each case the tender was declined. The ships refused to pay the pilotage fees imposed by the following sections of the Political Code of the State of California:

" '2468. Pilotage and half pilotage. All vessels sailing under an enrollment, and licensed and engaged in the coasting trade between the port of San Francisco and any other port of the United States shall be exempt from all pilotage unless a pilot be actually employed. All foreign vessels and all vessels from a foreign port or bound thereto, and all vessels sailing under a register between the port of San Francisco and any other port of the United States shall be liable for pilotage as provided in section twenty-four hundred and sixty-six (2466) of this code.

" '2466. Rates of pilotage at San Francisco. The following shall be the rates of pilotage into and out of the

harbor of San Francisco: All vessels under five hundred
(500) tons three ($3.00) dollars per foot draught; all ves-
sels over five hundred (500) tons three ($3.00) dollars per
foot draught and three (3c.) cents per ton for each and
every ton registered measurement; and every vessel
spoken inward or outward bound except as hereinafter
provided shall pay the said rates. A vessel is spoken by
day by a pilot boat displaying a union jack or by night
displaying a torch or flare up within a distance of three (3)
miles of the vessel. In all cases where inward bound ves-
sels are not spoken until inside of the bar the rates of
pilotage herein provided shall be reduced fifty (50) per
cent. Vessels engaged in the whaling or fishing trade shall
be exempt from all pilotage except where a pilot is actually
employed.

" '2432. Vessel, owner, etc., liable for pilotage. All
vessels, their tackle, apparel and furniture, and the master
and owners thereof, are jointly and severally liable for
pilotage fees, to be recovered in any court of competent
jurisdiction.'

"On February 28, 1871, Congress enacted an act 'for
the better protection of persons on vessels propelled in
whole or in part by steam, etc.,' section 51 of which is
pertinent to these cases. This section was in 1873 re-
enacted in sections 4401 and 4444 of the revised statutes.
The portions of the section and its subsequent codification
on which the court's questions are based are printed in
parallel columns as follows:

" 'An act to Provide for the      "Revised Statutes Title
Better Security of Life on         LII.   'Regulation of
Board of Vessels Pro-              Steam Vessels.'
pelled in Whole or in
Part by Steam.'

" ' Section 51. And be it          "R. S. 4401. '. . . and
further enacted that . . .         every coastwise sea going

every coastwise sea-going steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats. . . . Nor shall any pilot charges be levied by any such (State) authority upon any steamer piloted as herein provided . . . Provided, however, that nothing in this act shall be construed to annul or affect any regulation established by the laws of any State requiring vessels entering or leaving a port in any such State, other than coastwise steam vessels, to take a pilot duly licensed, or authorized by the laws of such State, or of a State situate upon the waters of such State.'

" (The above in a single paragraph.)

steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats.'

"R. S. 4444. '. . . nor shall any pilot charges be levied by any such (State) authority upon any steamer piloted as provided by this title . . . Nothing in this title shall be construed to annul or affect any regulation established by the laws of any State requiring vessels entering or leaving port in any such State, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such State, or of a State situate upon the waters of such State.'

"The pilots, appellants here, libelled the vessels in the United States District Court for the Northern District of California. The two cases were consolidated for trial in

the District Court. It was contended that there was a conflict between the Federal and the state law as to the control of the vessels for purposes of bar pilotage. The libelants relied upon the state law giving the resident state bar pilotage control of the vessels in question when entering or leaving port. The District Court held that the Federal law excluded these vessels from state control and the libels were dismissed.

"On appeal to this court it has become apparent that the decision of the two cases involves a question of conflict of jurisdiction between the State and the Federal Government as to the pilotage of all steam vessels touching at both foreign and domestic ports on the one voyage and also as to the pilotage of the large number of registered steam vessels now engaged in traffic between ports of the Atlantic and the Pacific coasts of the United States, both by way of the Isthmus of Tehuantepec and the Isthmus of Panama and around South America. The decision will also affect the very large number of steam vessels which may reasonably be expected to sail between American ports on the Atlantic and the Pacific Oceans, via the Panama Canal.

"In determining the intent of Congress in passing the Act of February 28, 1871, the court had under consideration the following statutes: the Act of August 7, 1789, codified in section 4235 of the Revised Statutes, recognizing and adopting the pilotage regulations of the various States so far as bar and entrance pilotage is concerned; section nine, paragraph nine and ten of the Steamship Act of August 30, 1852, creating a certain class of Federal pilots, (10 Statutes at Large, 67, reënacted in chapter 100, sections 18 and 14 of Act of February 28, 1871, (codified in Revised Statutes 4442 and 4438); Act of May 27, 1848, (codified in Revised Statutes 3126), permitting registered vessels sailing between ports of the United States to trade with foreign ports; section twenty of the Act of Febru-

ary 18, 1793 (1 Stats. 313, codified in Revised Statutes, 4361), providing for the regulation and duties of officers on registered vessels as to the carriage of foreign goods and distilled liquors and the making of manifests.

"The members of the court are unable to agree as to the interpretation of the cited portions of section 51 of the Act of February 28, 1871, codified in Revised Statutes, sections 4401 and 4444, and for this reason, and because of the importance of the interests affected, both governmental and commercial, the Circuit Court of Appeals for the Ninth Circuit certify the following questions to the United States Supreme Court, and request its instructions upon them.

"1. Are coastwise sea going steam vessels, sailing under register, and having officers with federal pilot's licenses, free from any liability for pilotage fees created by sections 2468, 2466 and 2432 of the Political Code of the State of California, upon the proper tender of services of resident bar pilots of the State pilotage establishment, when entering or leaving the port of San Francisco, by virtue of section 51 of the Act of February 28, 1871, entitled 'An Act to provide for the Better Security of Life on Board of Vessels Propelled in Whole or in Part by Steam,' as reënacted of date December 1, 1873, in sections 4401 and 4444 of the Revised Statutes?

"2. Are there any provisions of title 52 of the Revised Statutes which may be construed as exempting coastwise sea going steam vessels sailing under register, whose officers have federal pilot's licenses from any liability for pilotage fees created by sections 2468, 2466 and 2432 of the Political Code of the State of California, upon the proper tender of services of resident bar pilots of the State pilotage establishment, when entering or leaving the port of San Francisco, State of California, under the rule of construction laid down in the last sentence of section 51 of the Act of February 28, 1871, entitled 'An Act to Provide

for the Better Security of Life on Board of Vessels Propelled in Whole or in Part by Steam,' and as reënacted in section 4444 of the Revised Statutes?

"3. Did Congress intend to classify with the 'coastwise vessels' referred to in the last proviso of section 51 of the Act of February 28, 1871, entitled 'An Act for the Better Security of Life on Vessels Propelled in Whole or in Part by Steam,' and reënacted in section 4444 of the Revised Statutes, registered steam vessels engaged in commerce with both foreign and domestic ports on the same voyage?

"4. Did Congress, in enacting the last proviso of section 51 of the Act of February 28, 1871, reënacted in section 4444 of the Revised Statutes, intend to exempt registered steam vessels whose officers have federal pilot's licenses, from any liability for pilotage fees created by sections 2468, 2466 and 2432 of the Political Code of the State of California, upon proper tender of services of resident bar pilots of the State pilotage establishment, on entering or leaving the port of San Francisco on regular voyages, on which they steamed to Victoria, British Columbia, and carried cargo, mail and passengers direct thereto and direct therefrom; when, after leaving Victoria, British Columbia, on the outward voyage, they steamed to Puget Sound ports of the State of Washington, for which they had originally cleared, and returned therefrom to Victoria, British Columbia; when the stop at Victoria, British Columbia, is for about an hour on each occasion; when at least ninety (90) per cent of the passenger and cargo traffic for the outward and inward voyages is between the port of San Francisco and the ports of Washington; and when the traffic with the foreign port may be deemed en route between the domestic ports?"

*Mr. William Denman* for Anderson and Jordan.

*Mr. Graham Sumner*, with whom *Mr. George W. Towle*,

*Mr. Thomas Thacher, Mr. Thomas D. Thacher* and *Mr. Leland B. Duer* were on the brief, for Steamship Companies.

MR. JUSTICE HUGHES, after making the above statement, delivered the opinion of the court.

When the Constitution of the United States was adopted, each State had its own regulations of pilotage. While this subject was embraced within the grant of the power "to regulate commerce with foreign nations, and among the several States" (Art. I, § 8), Congress did not supersede the state legislation, but by the act of August 7, 1789, c. 9, § 4 (1 Stat. 53, 54; R. S., § 4235), it was enacted that "all pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress." This was "a clear and authoritative declaration by the first Congress, that the nature of this subject is such, that until Congress should find it necessary to exercise its power, it should be left to the legislation of the States;" and it has long been established by the decisions of this court that, although state laws concerning pilotage are regulations of commerce, they fall within that class of powers which may be exercised by the States until Congress shall see fit to act. *Cooley* v. *Board of Wardens*, 12 How. 299, 319, 321; *Steamship Company* v. *Joliffe,* 2 Wall. 450, 459; *Ex parte McNiel*, 13 Wall. 236, 240; *Wilson* v. *McNamee*, 102 U. S. 572; *Olsen* v. *Smith*, 195 U. S. 332, 341. In 1837 (5 Stat. 153), it was provided that a master of a vessel entering or leaving a port situate upon waters which are the boundary between two States, might employ a pilot licensed by either State. There was no other Federal legislation upon the subject of pilots until 1852;

and thus "for more than sixty years" it was "acted on by the States, and the systems of some of them created and of others essentially modified during that period." *Cooley* v. *Board of Wardens, supra,* p. 321.

The act of August 30, 1852, c. 106 (10 Stat. 61), contained provisions for the licensing of pilots of steam vessels (§ 9, *Ninth, id.* 67). In *Steamship Company* v. *Joliffe, supra,* it was contended that the statute of the State of California of May 20, 1861, providing for port pilots at San Francisco, was in conflict with this act; but the court took the contrary view, holding that the Federal law did not relate to port pilots. The court said (pp. 460, 461): "The act of 1852 was intended, as its title indicates, to provide greater security than then existed for the lives of passengers on board of vessels propelled in whole or part by steam. . . . The act contains few provisions relating to pilots; indeed, it was not directed to the remedy of any evils of the local pilot system. There were no complaints against the port pilots; on the contrary, they were the subjects of just praise for their skill, energy, and, efficiency. The clauses respecting pilots in the act relate, in our judgment, to pilots having charge of steamers on the voyage, and not to port pilots; and the provision that no person shall be employed or serve as a pilot who is not licensed by the inspectors has reference to employment and service on the voyage generally, and not to employment and service in connection with ports and harbors."

In 1866, Congress passed a more comprehensive statute embracing port pilotage (act of July 25, 1866, c. 234, 14 Stat. 227). After defining the vessels subject to the navigation laws of the United States, it enacted (§ 9) that "every sea-going steam vessel," so subject, should "when under way, except upon the high seas, be under the control and direction of pilots licensed by the inspectors of steam vessels; vessels of other countries and public vessels of the United States only excepted." In the following

year, however, this section was amended by the addition of a proviso that the act should not be construed to "annul or affect any regulation established by the existing law of any State requiring vessels entering or leaving a port in such State" to take a state pilot (act of February 25, 1867, c. 83, 14 Stat. 411). The existing state laws respecting port pilotage again became operative. *Sturgis* v. *Spofford,* 45 N. Y. 446, 451; *Henderson* v. *Spofford,* 59 N. Y. 131, 133.

The acts of 1852 and 1866 were repealed by the act of February 28, 1871, c. 100 (16 Stat. 440), the provisions of which were reënacted in Title 52 of the Revised Statutes. This act prescribed general regulations with respect to the licensing of pilots of steam vessels (§§ 14, 18; R. S. 4438, 4442) similar to those of the act of 1852. The requirement as to the port pilotage of coastwise sea-going steam vessels were set forth in § 51, to which reference is made in the questions propounded in the certificate. This section was as follows:

"SEC. 51. *And be it further enacted,* That all coastwise sea-going vessels, and vessel [s] navigating the great lakes, shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof; and all vessels, propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam-vessels in passing, as provided by this act; and every coastwise sea-going steam-vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats. And no State or municipal government shall impose upon pilots of steam-vessels herein provided for any obligation to procure a State or other license in addition to that issued by the United States, nor other

regulation which will impede such pilots in the performance of their duties, as required by this act; nor shall any pilot charges be levied by any such authority upon any steamer piloted as herein provided, and in no case shall the fees charges for the pilotage of any steam-vessel exceed the customary or legally established rates in the State where the same is performed: *Provided, however,* That nothing in this act shall be construed to annul or affect any regulation established by the laws of any State requiring vessels entering or leaving a port in any such State, other than coastwise steam-vessels, to take a pilot duly licensed, or authorized by the laws of such State, or of a State situate upon the waters of such State."

These provisions were incorporated in §§ 4401 and 4444 of the Revised Statutes, which are still in force.[1] The

---

[1] SEC. 4401. All coastwise sea-going vessels, and vessels navigating the great lakes, shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof; and all vessels, propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam-vessels in passing, as provided by this Title; and every coastwise sea-going steam-vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats.

SEC. 4444. No State or municipal government shall impose upon pilots of steam-vessels any obligation to procure a State or other license in addition to that issued by the United States, or any other regulation which will impede such pilots in the performance of the duties required by this Title; nor shall any pilot-charges be levied by any such authority upon any steamer piloted as provided by this Title; and in no case shall the fees charged for the pilotage of any steam-vessel exceed the customary or legally established rates in the State where the same is performed. Nothing in this Title shall be construed to annul or affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, other than coastwise steam-vessels, to take a pilot duly licensed or authorized by the laws of such State, or of a State situate upon the waters of such State.

change of arrangement, which placed portions of what was originally a single section in two separated sections cannot be regarded as altering the scope and purpose of the enactment. For it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed. *United States* v. *Ryder,* 110 U. S. 729, 740; *United States* v. *LeBris,* 121 U. S. 278, 280; *Logan* v. *United States,* 144 U. S. 263, 302; *United States* v. *Mason,* 218 U. S. 517, 525.

It will be observed that the requirement of § 51 of the act of 1871 (R. S. § 4401), as to the piloting of coastwise sea-going steam vessels, is limited and explicit. It is that "every coastwise sea-going steam-vessel subject to the navigation laws of the United States and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats." This covers port pilotage, for it relates to such vessels "when under way, except on the high seas;" and it applies only to those *"not sailing under register."*

American vessels are of two classes, those registered, and those enrolled and licensed. "The purpose of a register is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found. The purpose of an enrolment is to evidence the national character of a vessel engaged in the coasting trade or home traffic, and to enable such vessel to procure a coasting license. The distinction between these two classes of vessels is kept up throughout the legislation of Congress on the subject, and the word register is invariably used in reference to the one class and enrolment, in reference to the other." *The Mohawk,* 3 Wall. 566, 571. See *Huus* v. *New York & Porto Rico Steamship Co.,* 182 U. S. 392, 395. The act of December 31, 1792 (1 Stat. 287, c. 1), applicable exclusively to vessels engaged in foreign commerce and to their

registry, and the act of February 18, 1793 (1 Stat. 305, c. 8), relating to vessels engaged in the coasting trade and fisheries, and to their enrollment, constituted the basis for the regulations of the two classes. The latter act contained a provision (§ 20, *id.* 313; R. S. § 4361) that any registered vessel when employed in going from one district in the United States to any other district should "be subject (except as to the payment of fees) to the same regulations, provisions, penalties, and forfeitures" as those prescribed in the case of vessels licensed for carrying on the coasting trade. This, however, had no reference to pilotage, for Congress had not made regulations upon that subject. In 1848 (act of May 27, 1848, 9 Stat. 232, c. 48; R. S. § 3126) it was provided that any vessel, "on being duly registered," might engage in trade between ports of the United States "with the privilege of touching at one or more foreign ports during the voyage, and land and take in thereat merchandise, passengers and their baggage, and letters, and mails."

Thus, at the time of the passage of the act of 1871, there were coastwise sea-going steam vessels sailing under register and having this privilege of touching at foreign ports, and also coastwise sea-going steam vessels, which were enrolled and licensed, not sailing under register. It was with respect to the vessels of the latter sort that Congress imposed the requirement of § 51 to use Federal pilots. The reason for the distinction may be found in the fact that the registered vessels, under the conditions of trade then existing, would presumably be engaged in the longer voyages, touching at foreign ports where Federal pilots would not avail and at domestic ports for all of which the ship's pilot might not hold a Federal license; and, as Congress did not create local Federal establishments for port pilotage, it was evidently deemed unwise to compel registered vessels in entering and leaving ports to be under the control of Federal pilots. Certainly the distinction was made; and

the necessary effect of the limitation of the requirement was to exempt the coastwise sea-going steam vessels, which did sail under register, from its terms.

As these registered vessels were free from this Federal regulation, they would be under no compulsion whatever as to port pilotage save by virtue of the operation of state laws. And it is an inevitable conclusion, on considering the prior history of pilotage regulations in this country and the policy which has been maintained with respect to the exercise of state authority, that, as Congress did not see fit to require Federal pilots, it left the regulation of port pilotage as to such vessels to the States.

It is contended, however, that although the employment of Federal pilots was not made compulsory for coastwise sea-going steam vessels sailing under register in entering and leaving ports, still they had an option to use such pilots, and, if in fact such a vessel was piloted by a Federal pilot, she could not be required to take a state pilot. The argument is based on the following provisions of § 51 (now found in R. S. § 4444):

"And no State or municipal government shall impose upon pilots of steam-vessels herein provided for any obligation to procure a State or other license in addition to that issued by the United States, nor other regulation which will impede such pilots in the performance of their duties, as required by this act; nor shall any pilot charges be levied by any such authority upon any steamer piloted as herein provided, . . ."

This language gives no support to the contention. Wherever the regulations of the statute applied, they were absolute. The "pilots of steam-vessels herein provided for" were those whom, under the provisions of the statute, the vessels described were bound to use. It was upon the pilots, whose use was made compulsory by the Federal law, that "no State or municipal government" was to impose any obligation to procure a state or other

license, or any regulation which would impede them "in the performance of their duties, as required by this act." The "steamer piloted as herein provided" was the steamer required to be so piloted, and it was upon such steamer that no pilot charges were to be levied by state authority. The same construction must be given to these provisions as reënacted in § 4444 of the Revised Statutes, where the words "piloted as provided by this Title" take the place of the words "piloted as herein provided." The Federal requirement as to port pilotage of coastwise sea-going steam vessels was applicable only to those "not sailing under register;" as to those which sailed under register, there were no port pilots provided for, and the regulation of pilotage in the case of such vessels entering and leaving the state ports was left to the States. The fact that a vessel of this sort had on board a pilot holding a Federal license when the services of such a pilot were not required by the Federal law, did not oust the State of the power to compel the use of a state pilot.

Nor was the proviso in § 51 of the act of 1871 (now the last sentence of R. S. § 4444) a restriction of this state authority. This proviso was as follows:

"*Provided, however,* That nothing in this act shall be construed to annul or affect any regulation established by the laws of any State requiring vessels entering or leaving a port in any such State, other than coastwise steam-vessels, to take a pilot duly licensed, or authorized by the laws of such State, or of a State situate upon the waters of such State."

Manifestly, this did not enlarge the scope of the requirement as to Federal pilotage contained in the preceding portion of the section. The words "other than coastwise steam-vessels" did not mean that the State could not require port pilots for coastwise sea-going steam vessels sailing under register. For this would be to impute to Congress the intent to withdraw from the State the power to

act in the cases omitted from the Federal regulation. Even on the construction of the statute for which the appellees contend, it is conceded that "a coastwise steam vessel sailing under register which is not piloted by a federal pilot may be compelled by the State to take a State pilot when entering or leaving port." And, if in any case the vessel might be forced to take a pilot under the state law, it would necessarily follow that it is not excluded by the proviso from the operation of that law. The natural interpretation of the proviso is that it was intended to prevent misapprehension as to interference with local rules—to declare the continued efficacy of those rules when not in conflict with the Federal authority—and not to introduce an independent limitation of state power over port pilotage with respect to registered steam vessels, where the Federal control had not been asserted. The enacting clause and the proviso are to be read together "with a view to carry into effect the whole purpose of the law." *White* v. *United States*, 191 U. S. 545, 551. So read, the words "other than coastwise steam-vessels" must be deemed to refer to those "not sailing under register," to which the requirement of Federal pilots applied. The same meaning must be ascribed to this clause as it now appears in § 4444 of the Revised Statutes, taken as it must be in connection with § 4401.

The statute was thus construed in *Murray* v. *Clark* (1874), 4 Daly, 468, affirmed, 58 N. Y. 684, where a steamer sailing under register between New York and New Orleans, and touching at a foreign port as was her privilege, was held to be subject to the law of the State of New York as to pilotage in entering the port of New York, although at the time she was under the control of her master who was a pilot licensed by the Federal inspectors. In *Joslyn* v. *Nickerson* (1880), 1 Fed. Rep. 133, while it was held that a libel for pilotage could not be sustained, for the reason that the law of Massachusetts,

in question, was not by its terms applicable, Judge Lowell said (page 135): "This statute" (referring to the Federal act of 1866) "has been modified, and the employment of such a pilot is now compulsory only upon coasting steam vessels not sailing under a register. Rev. St., § 4401; *Murray* v. *Clark*, 4 Daly, 468, affirmed, 58 N. Y. 684. This vessel, therefore, was not bound to carry such a pilot, and was bound by any law of Massachusetts which might require her to take a local pilot. Rev. St., § 4444." In *Spraigue* v. *Thompson*, 118 U. S. 90, 96, where a claim for pilotage under the law of Georgia was disallowed, the steamer "was a coastwise sea-going steam vessel," and "was not sailing under register." In *Huus* v. *New York & Porto Rico Steamship Co.*, 182 U. S. 392, 394, after quoting from §§ 4401 and 4444 of the Revised Statutes, the court said: "The general object of these provisions seems to be to license pilots upon steam vessels engaged in the *coastwise* or interior commerce of the country, and at the same time, to leave to the States the regulation of pilots upon all vessels engaged in *foreign* commerce." There, the steamer was enrolled and licensed for the coasting trade under the laws of the United States and was engaged in trade between Porto Rico and New York after the treaty of cession. It was held that she was not within the pilotage laws of New York.

The provisions of the Political Code of the State of California, set forth in the certificate, do not apply to coastwise sea-going steam vessels "not sailing under register" and are not in conflict with the statutes of the United States. Their enforcement is simply a recognition of the limits which Congress has thus far set to the exercise of the unquestioned Federal power. The criterion is not whether the stops of registered vessels at foreign ports may be deemed en route between domestic ports, and is not to be found in the length of such stops or in the relative amount of foreign trade. The statute made the dis-

tinction, in the light of the well-known conditions of trade which existed at the time of its enactment, between coastwise sea-going steam vessels, not sailing under register, and those which did sail under register. Whether or not it is wise to establish Federal rules as to port pilotage for the registered vessels exempted from this regulation is a question for Congress to determine.

We conclude that each one of the questions certified should be answered in the negative.

*It is so ordered.*