**SOUTHERN PAC. CO. v. RAILROAD COMMISSION OF CALIFORNIA et al. (BROTHERHOOD OF RAILROAD TRAINMEN et al., Interveners).**

No. 3683.

District Court, N. D. California, S. D.

May 6, 1935.

Guy V. Shoup, Henley C. Booth, and Burton Mason, all of San Francisco, Cal., for plaintiff.

Ira H. Rowell, Roderick B. Cassidy, and Frank B. Austin, all of San Francisco, Cal., for defendant Railroad Commission of California.

M. Mitchell Bourquin, of San Francisco, Cal., for interveners.

Before WILBUR, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

ST. SURE, District Judge.

This is a suit in equity brought by the Southern Pacific Company, seeking to enjoin the enforcement of an order of the State Railroad Commission. The Brotherhood of Railroad Trainmen complained to the commission that the rules and practices of the Southern Pacific Company in operating freight trains in the Sierra Nevada Mountains from Roseville, Cal., to the Nevada state line subjected train crews to unreasonable hardship and danger. After a hearing, the commission issued the following order:

"It is hereby ordered that during the period between October 1st and March 31st, each year, the Southern Pacific Company equip all freight trains in excess of 57 cars, exclusive of the rear caboose, operating in both easterly and westerly directions on that part of its line between Roseville, California, and the California-Nevada state line with an additional caboose car to be placed approximately midway between the rear caboose and the leading engine of said train; and

"It is hereby further ordered that the Southern Pacific Company so modify its rules in respect to the duties of trainmen as to permit of the reasonable and necessary use of caboose cars by members of the train crew."

Hearing was had before a statutory three-judge court (section 266, Judicial Code, 28 USCA § 380), and an interlocutory injunction was granted. The suit was referred to one of the members of this court as special master, who heard the evidence and transmitted the transcript thereof to this court. Final hearing and arguments were had, and the case is now ready for decision.

The issues may be briefly stated as follows: Plaintiff alleges that the order interferes with and places an undue burden upon interstate commerce, and that the order is so vague and uncertain as to render it unreasonable and arbitrary, and therefore violates the commerce clause of the Constitution (article 1, § 8, cl. 3).

The commission's defense is that the extreme and unusual condition of weather during the winter months and the topo-

graphy of the country covered by the order justified its issuance in the interest of public health and safety; that the order is not capricious or arbitrary.

Said interveners as parties interested in sustaining the order of defendant commission participated in the hearing, and the conclusions reached herein are also applicable to them.

The pleadings and the undisputed evidence establish that the plaintiff is a common carrier engaged in interstate commerce, and is subject to the regulations of the Public Utilities Act of the state of California (St. Cal. 1915, p. 115, as amended), and of the act of Congress known as the Interstate Commerce Act (49 USCA § 1 et seq.); that the defendant commission is the duly constituted board, consisting of five members, which administers the regulatory powers over public utilities in the state; that intervener Brotherhood of Railroad Trainmen is a labor organization composed of trainmen employed in train and yard service of railroads in various parts of the United States; intervener Harry See is a citizen and resident of California, and is an official of said brotherhood, having the title of "state representative"; that plaintiff operates a line of railroad between and in the several Western states, among them California and Nevada; that the line involved in this controversy runs from Oakland, Cal., in a general easterly direction across the Sierra Nevada Mountains and the boundary line common to California and Nevada; that said railroad line passes through Roseville (a division point 18 miles northeast of Sacramento), Emigrant Gap, Andover, and Truckee, Cal., and on into Reno and Sparks, Nev., the latter station also a division point. The line is double tracked between Roseville and Sparks. Two-tenths of a mile west of the state boundary line plaintiff has established a station called Calvada. This station has no switching facilities for making up or breaking up trains; nor is it a station where freight is received for shipment or delivered. From Calvada to Sparks is 17.6 miles. It was shown that 94 per cent. of the freight trains passing over this line consist of 57 cars or more; the general average being approximately 80; that, of all of the freight trains passing over the line in 1933 during the six months covered by the order, 93.85 per cent. of the cars in eastbound traffic, and 98.36 per cent. of the cars in westbound traffic, were inter-state. There was not a single train during that period that was wholly intrastate.

Preliminarily the defendant commission urges that it is not within the function of this court "to review the evidence for the purpose of determining whether it would have reached some other conclusion * * * nor to substitute its judgment for that of the Commission." A rule for our guidance is found in Mugler v. Kansas, 123 U. S. 623, 661, 8 S. Ct. 273, 297, 31 L. Ed. 205: "If, therefore, a statute [order] purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

That the commerce clause of the Constitution (article 1, § 8, cl. 3) has conferred upon Congress full power to regulate interstate commerce is all but elementary, and any attempt by a state to interfere with such exclusive regulation has been held unconstitutional and void. Simpson v. Shepard (Minnesota Rate Case), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Wilmington Trans. Co. v. Railroad Commission of California, 236 U. S. 151, 154, 35 S. Ct. 276, 59 L. Ed. 508; Oregon-Washington R. & N. Co. v. State of Washington, 270 U. S. 87, 46 S. Ct. 279, 70 L. Ed. 482: "The general principles governing the exercise of state authority when interstate commerce is affected are well established," said Chief Justice Hughes in the Minnesota Rate Case, supra, 230 U. S. 352, at pages 398, 399, 33 S. Ct. 729, 739. "The power of Congress to regulate commerce among the several states is supreme and plenary. It is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution.' Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L. Ed. 23. * * *

"This reservation to the states manifestly is only of that authority which is consistent with, and not opposed to, the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is car-

ried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere. [Citing cases.]

"The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive."

The commission contends that the order was not directed at interstate commerce, and that it has no extraterritorial effect.

█ In determining the validity of a statute, courts are not bound by the form. It is their duty to look at the substance. The order is to be determined in the light of its effect *upon* interstate commerce. In the Minnesota Rate Case, supra, the acts and orders prescribed by the state commission applied solely to intrastate commerce, but, despite this obvious purport, their inevitable effect was the basis of the court's decision on one branch of the case.

Plaintiff challenges the order upon the ground of its extraterritorial effect. While the order designates only intrastate lines, it has a direct bearing on interstate commerce. Defendant commission, appreciating that in practical operation the order would have extraterritorial effect, said in its decision:

"Legally, of course, any order made by this Commission must be limited to intrastate train operations. Since the company does not now have trackage facilities at Calvada adequate to permit of the addition or withdrawal of a caboose from trains at this point, it would be compelled, if the work is to be done there, to construct such facilities. The estimated cost of construction is $6,700.00. The delay occasioned there by the necessary switching would be approximately thirty minutes. Practically, however, no such costs or delays would be occasioned, for obviously, if the company is required to comply with the trainmen's demand, it will actually perform such switching at Sparks, Nevada, its regular division point, seventeen miles east of the state line."

Plaintiff pleads that, in the interest of economy and expeditious handling of interstate commerce, it would, if forced to a choice, take the course which the commission stated was obvious.

█ Upon the question of whether or not the enforcement of the order would impose such a direct and substantial burden on interstate commerce as to amount to an interference, the element of cost is a matter to be taken into consideration. Missouri Pacific R. Co. v. Norwood, 283 U. S. 249, 255, 51 S. Ct. 458, 75 L. Ed. 1010.

Defendant commission's answer admitted that operating expenses would be increased $10,000 if facilities were installed at Calvada, and $7,000 if installed at Sparks. Plaintiff's evidence showed that the additional annual expense of necessary switching operations at Sparks would be not less than $17,350; that this estimate does not include an additional expense caused by delay of trains due to the necessity of clearing superior trains, or by setting out or picking up mid-train cabooses at intermediate points to relocate such cabooses due to changes in train consist; that, of 1,216 trains affected by the order in 1933 (if the order had then been in force), in order to comply with the Full Crew Law (California Statutes 1915, p. 832), plaintiff would have been compelled either to drop one car out of 393 trains or to employ another brakeman; that it would be obliged to acquire at least 15 steel underframe caboose cars, at a cost of not less than $46,500; and that the total added capital investment would be not less than $53,000.

Defendant commission argues that "a considerable part of these supposed costs are not direct or additional charges, and approximately one-half consists of wages assumed to be paid for the extra time required in performing the switching serv-

ice"; that plaintiff "now has on hand a surplus of steel frame caboose cars."

It is undisputed that compliance with the order will necessitate added capital investment and increased costs of operation, but the exact amounts of such increases are in controversy. In the light of the facts disclosed, we are not prepared to say that the increased financial burden per se would be so great as to justify a finding of unreasonableness.

On the question of burden amounting to an interference, the element of delays is very important. Plaintiff established by tests, in the presence of representatives of the commission and of the trainmen, that, in order to comply with the order, the additional switching operations at Roseville would require from 25 to 35 minutes, and at Sparks 25 to 30 minutes, both under favorable conditions. There was also evidence to establish that during October and November of each year a large volume of the freight shipped through Roseville consists of perishable commodities (fruits, vegetables, live stock, etc.), and that it is not uncommon for 5 or more trains which would be affected if the order were enforced to depart at intervals of 45 minutes. It is pointed out that any undue delay to any one of the trains becomes cumulative. Another important phase of the evidence is that whenever, by increase or decrease in the number of cars at intermediate stations between Roseville and Sparks, the trains become of such length as to require a mid-train caboose car, further delays would result. A survey showed that, of 1,216 trains studied during the six months period of 1933, compliance with the order would have required switching at intermediate stations in 230 instances, on account of a difference of 5 cars in the length of the train.

Although the evidence as to the exact amount of delay by actual tests is contradictory, we think it is shown that compliance with the order will result in delay to plaintiff's interstate trains. In its opinion, above quoted, defendant commission states that the "delay occasioned there by the necessary switching would be approximately thirty minutes." Plaintiff's evidence shows a delay of from 25 to 35 minutes at Roseville and of from 25 to 30 minutes at Sparks.

Defendant commission argues that, "although experts may have reasonable difference of opinion as to the time required for cutting in or out of a caboose, and actual experience may prove that the time will vary according to conditions encountered, it is inconceivable that in efficient train operation more than 15 or 20 minutes would be consumed in placing a single car in a train at yards where trains of great length are made up within a period of a few hours. But assuming the taking of a longer time to perform the operation at both Roseville and Sparks, it does not follow that the departure of trains would be delayed a like period. * * * On this point it may be observed that the seriousness of the delay to trains caused by the addition of a midtrain caboose, whatever period it may reasonably be, is not what plaintiff would have us believe."

The conclusion is inescapable that compliance with the order will necessitate delay and interfere with the continuous movement of interstate freight trains, but we cannot say that such delay per se is a direct burden upon interstate commerce.

It is conceded that states, in the absence of regulation by Congress, may, under the police power, pass legislation which incidentally affects interstate commerce. Minnesota Rate Case, supra; Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835; Anderson v. Pacific Coast S. S. Co., 225 U. S. 187, 32 S. Ct. 626, 56 L. Ed. 1047; Mintz v. Baldwin, 289 U. S. 346, 53 S. Ct. 611, 77 L. Ed. 1245; Missouri Pacific v. Norwood, 283 U. S. 249, 51 S. Ct. 458, 75 L. Ed. 1010. It is equally well settled that a state may not under the guise of police power directly interfere with interstate commerce. Hall v. De Cuir, 95 U. S. 485, 24 L. Ed. 547; Kansas City So. Ry. v. Kaw Valley Dist., 233 U. S. 75, 34 S. Ct. 564, 58 L. Ed. 857; Covington & C. Bridge Co. v. State of Kentucky, 154 U. S. 204, 14 S. Ct. 1087, 38 L. Ed. 962; Philadelphia, etc., v. Pennsylvania, 122 U. S. 326, 7 S. Ct. 1118, 30 L. Ed. 1200. If the order bears a reasonable relationship to public health and safety, and does not transgress the constitutional protection of interstate commerce, the power of the state to make it cannot be questioned. Chicago R. I. & P. R. Co. v. Arkansas, 219 U. S. 453, 465, 31 S. Ct. 275, 55 L. Ed. 290; Missouri Pacific R. Co. v. Norwood, supra; New York, N. H. & H. R. Ry. v. New York, 165 U. S. 628, 631, 17 S. Ct. 418, 41 L. Ed. 853; Atlantic Coast Line R. Co. v. Georgia, 234 U. S. 280, 34 S. Ct. 829, 58 L. Ed. 1312. In Kansas City So. Ry. v.

Kaw Valley Dist., supra, 233 U. S. 75, at page 79, 34 S. Ct. 564, 565, 58 L. Ed. 857, the Supreme Court said: "The decisions also show that a state cannot avoid the operation of this rule by simply invoking the convenient apologetics of the police power. It repeatedly has been said or implied that a direct interference with commerce among the states could not be justified in this way. 'The state can do nothing which will directly burden or impede the interstate traffic of the company, or impair the usefulness of its facilities for such traffic.' [Citing cases.]"

Substantially all of the country between Roseville and Sparks is rugged and mountainous, with many miles of curved track, steep grades, numerous tunnels and snowsheds. Elevations vary from 162 feet at Roseville to 6,966 feet at Summit.

The transportation department of the plaintiff company issued rules and regulations which contain general instructions governing the operation of trains. The rules are enforced by a system of demerits for infractions.

Rule 843 reads: "The general direction and government of a train is vested in the conductor and all persons employed on the train will obey his instructions."

Rule 869 reads: "Trainmen must be so distributed over train as to control it most effectually. Unless otherwise provided, freight brakemen must be on top of their trains when descending grades and under other conditions when the safety of trains so requires."

Literal compliance with rule 869 would require brakemen to ride out on top of trains on all descending grades in either direction between Emigrant Gap and Andover, and there is sharp conflict in the evidence as to how rigidly the rule was observed in actual practice. The conflict need not be resolved, for on January 2, 1934, the plaintiff company issued a bulletin designating the line between Emigrant Gap and Andover as non ride-out territory.

The number of brakemen varies with the length of the train under the Full Crew Law. Each brakeman has charge of approximately 20 cars, and is required at stations and while the train is in motion to inspect cars; watch as far as reasonably practicable for overheated wheels, defective running gear, hanging rods or beams, etc.; he must observe and relay signals from engine to caboose, and vice versa.

The cars are equipped with safety devices, such as retaining valves for controlling the speed on descending grades, the use of which could stop or check the speed of the train.

Under regulations of the Interstate Commerce Commission and defendant commission, plaintiff is required to report all accidents to trainmen occurring during train operation which prevent the one injured from performing his regular duties for a period of three days or more out of the ten days next ensuing the accident. Plaintiff's records show that from January 1, 1927, to March 31, 1934, no brakeman suffered a reportable accident or disability while riding out on top of his train between Emigrant Gap and Loomis, or between Andover and Sparks, which could in any way be attributed to exposure, or which would have been prevented, or the damage lessened had the train been equipped with a caboose car placed midway in the train. There was no showing to refute this evidence.

Official records of the United States Weather Bureau for the months included in the order, covering a period of many years, of temperature and precipitation at Emigrant Gap (the highest and most easterly point in westbound ride-out territory), and at Truckee (the highest point in eastbound ride-out territory), show mean, minimum temperature and average snowfall as follows:

| | Elevation | | Mean Minimum Temperature | Average Snowfall |
|---|---|---|---|---|
| Emigrant Gap, | 5219 ft. | October | 42.3 degrees | 5.4 inches |
| | | November | 34.9 | 14.3 |
| | | December | 29.4 | 41.3 |
| | | January | 27.4 | 63.6 |
| | | February | 27.5 | 56.5 |
| | | March | 27.8 | 57.6 |
| Truckee, | 5819 ft. | October | 30. degrees | 3. inches |
| | | November | 24.1 | 10.9 |
| | | December | 14.5 | 31.6 |
| | | January | 15.6 | 49.4 |
| | | February | 16.2 | 43.9 |
| | | March | 21. | 35.6 |

Said records show further that the average mean temperatures at Emigrant Gap and Truckee, by months, for the affected six months, have been as follows: At Emigrant Gap, for October 53.6°, November 44.1°, December 36.8°, January 35.3°, February 36.2°, March 37.3°; at Truckee, for October 46.4°, November 37.9°, December 27.4°, January 26.8°, February 27.2°, March 33.2°.

924

Plaintiff points out that, while the order purports to require the operation of mid-train cabooses during the period of supposed unfavorable weather conditions, for the purpose of affording brakemen a convenient shelter and protection from alleged adverse weather conditions, it is shown that the weather conditions during a substantial portion of the six-month period affected by the order are generally more favorable than during a portion of the remainder of the year; that the records of the United States Weather Bureau show that at representative points between Roseville and Sparks, namely, Colfax, Emigrant Gap, Summit, Truckee, and Reno, the average minimum, maximum, and mean temperatures, and the average depth of snowfall, for the month of October, are generally at least as favorable as for the month of May, and in some instances somewhat more favorable; that similar weather conditions for the month of November are substantially equivalent to those for the month of April, and are generally at least as favorable, at all of said points; that weather conditions, as revealed by said records, are uniformly substantially more favorable during the month of October than during the month of April; that the order applies only to trains of 57 cars, or more, although any hazards due to severe weather, if they exist, affect trains of less than 57 cars to the same extent.

The number of days in which weather and temperature conditions would necessitate compliance with the order during the six-month period cannot be foretold, but it is a matter of common knowledge that during a considerable portion of the period climatic conditions would be favorable for trainmen riding out. The order fails to provide when and under what conditions of weather and temperature its provisions are to be enforced. It is obvious, therefore, that there would be many days during the six-month period when plaintiff would be daily required to put in, take out and haul, easterly and westerly, over the mountains, caboose cars not needed.

Beyond dispute, the brakemen would be more comfortable, and safer, inside a caboose than upon top of a freight train during severe weather. However, the contention of plaintiff that brakemen cannot efficiently perform their duties while riding in a mid-train caboose is impressive. Practical railroad experience has demonstrated that the safe operation of long freight trains in territory such as the facts here disclose requires immediate supervision, skill, knowledge, and experience on the part of brakemen, together with such safety devices as are provided. Even the defendant commission calls attention to the possible disastrous results in the event of a wreck of a freight train while passing a passenger train.

The issue relative to the order as an attempted regulation in the interests of health and safety is not free from doubt. But we think that what was said by the Supreme Court in Hall v. DeCuir, 95 U. S. 485, 24 L. Ed. 547, is applicable to the issue. In that case, 95 U. S. 485, at page 488, 24 L. Ed. 547, it is said: "The line which separates the powers of the States from this exclusive power of Congress is not always distinctly marked, and oftentimes it is not easy to determine on which side a particular case belongs. * * * But we think it may safely be said that State legislation which seeks to impose a direct burden upon inter-state commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business through his entire voyage. * * * Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it congress, which is untrammelled by State lines, has been invested with the exclusive legislative power of determining what such regulations shall be."

See, also, Lake Shore & M. S. Ry. v. Ohio, 173 U. S. 285, 305, 19 S. Ct. 465, 43 L. Ed. 702; South Covington, etc., Ry. v. City of Covington, 235 U. S. 537, 547, 35 S. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792; Missouri, Kansas & Texas R. Co. v. Texas, 245 U. S. 484, 38 S. Ct. 178, 62 L. Ed. 419, L. R. A. 1918C, 535.

The plaintiff contends that the "order is so indefinite and uncertain as to be unreasonable and arbitrary. It furnished no standard of reasonableness of use of the

extra caboose nor any definitions of the temperature or weather conditions or other circumstances in which brakemen shall be permitted to avail themselves of the shelter and protection afforded by the extra caboose and temporarily abandon the performance of the duties for which they are employed."

The violation by a public utility of an order of the commission or neglect or omission to obey the same is punishable by a penalty of not less than $500 or more than $2,000 for each offense (Public Utilities Act, § 76 (a), St. Cal. 1915, p. 166). Each violation and each day's violation is a separate and distinct offense (Public Utilities Act, § 76 (b); and officers and agents are punishable by a fine not exceeding $1,-000 or by imprisonment not exceeding one year (section 77 [page 167]); the commission has the duty of enforcement, and may sue in the name of the state (section 72 [page 165]), and the Attorney General must prosecute on request of the commission (section 72). The answer of defendant commission admits the allegation of plaintiff's complaint that it will exercise that power.

 We think that the contention of plaintiff must be sustained. Paraphrasing the language used in the case of Champlin Refining Company v. Corporation Commission of Oklahoma, 286 U. S. 210, 242, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403, the order must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to penalties. This is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And an order which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application lacks that degree of certainty essential to validity. The rule is invalid because it is so vague and indefinite as to be really no rule or standard at all. See, also, Connally v. General Construction Co., 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322; Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264; Railroad Commission of Indiana v. Grand Trunk Western R. Co., 179 Ind. 255, 100 N. E. 852; State ex rel. Public Service Commission et al. v. Atchison, etc., R. Co. et al., 125 Kan. 586, 264 P. 1056.

In Atchison, Topeka & S. F. Ry. Co. v. La Prade (D. C.) 2 F. Supp. 855, in which two members of the present statutory court participated, issues of interference and of unreasonableness were before the court as here. (The case was dismissed by the Supreme Court, in Ex parte La Prade, 289 U. S. 444, 53 S. Ct. 682, 77 L. Ed. 1311, on jurisdictional grounds.) Suit was brought to enjoin the enforcement of an act of the Legislature of Arizona known as the Train Limit Law, which prohibited the operation of passenger trains consisting of more than 14 cars, and freight trains consisting of more than 70 cars, exclusive of the caboose. It was held that any attempted enforcement of a state statute, passed under the guise of a police power, which directly affected interstate commerce to the extent of a regulation thereof, or which imposed a burden upon interstate commerce, was unconstitutional and void; and that the act was invalid as arbitrary and unreasonable and bore no reasonable relation to safety of persons or property.

Plaintiff contends that Congress has in fact exercised its authority to regulate the things which were subject of defendant commission's order. It is alleged in the bill of complaint that the order enters the field of regulation occupied by the power brake provisions of the Safety Appliance Act (USCA, title 45, § 1) and by section 26 of the Interstate Commerce Act (USCA, title 49, § 26). "Our point, in brief," says counsel for plaintiff, "is that to the extent to which the order is attempted to be justified because it will furnish an emergency valve in the mid-train caboose it is invalid because it attempts to supplement the Interstate Commerce Commission regulations on the general subject of air-brakes which do not provide for or require such a valve." In view of our holding herein, we think it unnecessary to discuss this point.

Under the evidence and the law, for the reasons stated herein, we are constrained to hold that the necessary effect of the order is to impose a direct and substantial burden, amounting to an interference with interstate commerce, and that the order is unreasonable and is in contravention of the commerce clause of the Constitution.

Let permanent injunction issue. Findings of fact and conclusions of law under rule 42[1] will be submitted by plaintiff, in accordance with views expressed herein.

---

[1] District Court Rule conforming to Equity Rule 70½ (28 USCA § 723).