**AMERICAN INDEPENDENT OIL COMPANY, Plaintiff,**

v.

**M. S. ALKAID, her engines, etc., and Alvion Steamship Corporation, and Clyde Valley, Defendants,**

**and against**

**Merritt-Chapman & Scott Corporation, Defendant-Impleaded.**

**No. 61 Ad. 1014.**

United States District Court
S. D. New York.

Nov. 22, 1967.

---

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff; Allan B. Lutz, Clare E. Walker, New York City, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for defendants M/V Alkaid and Alvion Steamship Corp.; John R. Sheneman, James D. Hanlon, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for defendant Clyde Valley; Eugene Underwood, New York City, of counsel.

Foley, Orainger & Darby, New York City, for defendant-impleaded Merritt-Chapman & Scott Corp.; Walter A. Darby, Jr., William F. Norton, Jr., New York City, of counsel.

WYATT, District Judge.

This is a suit in admiralty by the owner of a cargo of crude oil on account of (a) loss of a part of the oil and (b) contamination of other parts of the oil. The suit has been tried to the Court on the issue of liability; if there is liability, damages are by the pretrial order to be later determined or agreed upon.

There is jurisdiction under 28 U.S.C. § 1333.

Plaintiff American Independent Oil Company, Incorporated (Oilco) wanted to ship crude oil from the Persian Gulf to 138th Street and East River, New York City.

Defendant Alvion Steamship Corporation (Alvion) is the owner of the Motor Ship Alkaid.

Oilco chartered the Alkaid to carry the oil. About June 15, 1960 the Alkaid loaded some 22,500 long tons of fuel oil at a Persian Gulf (Kuwait) port; this oil belonged to Oilco. On July 14, 1960 the Alkaid reached an anchorage in the Narrows off Stapleton, Staten Island. About 0130 in the morning of July 15, two tugs belonging to Moran Towing & Transportation Co., Inc. (Moran) joined the Alkaid at the anchorage and Clyde Valley, a licensed pilot, went aboard the Alkaid. Daylight Saving Time was then in effect in New York (General Construction Law, McKinney's Consol. Laws, c. 22, § 52) and times expressed

herein are Eastern Daylight Saving Time. The ship got under way for its destination up the East River, with Valley acting as pilot and with the tugs accompanying. Shortly after passing under the Williamsburg Bridge going upriver, the ship struck something below the water, ruptured some of her cargo tanks, and lost some oil cargo. This was about 0233 on the morning of July 15 and is referred to as the "upriver stranding"; the ship did not stop or even lose speed when it struck the object below water.

The injured ship continued upriver to the area near East 42nd Street where she was intentionally pushed to the west side of the East River alongside the seawall near the United Nations Building. She was held by the tugs in position against the wall, her bow upriver.

During the morning of July 15, Alvion arranged for salvage to be performed by Merritt-Chapman & Scott Corporation (Merritt), a professional salvor. About 1330 on July 15, the Master of the Alkaid signed a salvage agreement with Merritt and Merritt then took over control of the ship.

Merritt took the ship down river in the afternoon of July 15. As she was going down the East River, with three tugs now assisting, she stranded in an area slightly above the Williamsburg Bridge; this was about 1540 in the afternoon of July 15 and is referred to as the "downriver stranding". Merritt was able to refloat the ship by 2245 on the same day and got her under way, with a fourth tug now assisting; the flotilla arrived about 0230 on July 16 at the anchorage off Stapleton (or nearby Tompkinsville), Staten Island. There the Alkaid remained until July 20, during which period a part of her cargo oil was transferred to four barges. These barges took their cargoes to a pier of the Bayonne Terminal Warehouse Company at Bayonne, New Jersey, and discharged the oil into shore tanks.

On July 20, the Alkaid was itself moved to the pier at Bayonne and on the same date began discharging cargo oil (including some mixed with water) into shore tanks. Discharge was completed on July 28. Thereafter the ship was taken to a drydock and was delivered by the salvor to the owner on August 10, 1960.

As a result of the events described, there was a loss of cargo by leakage from the ship. In addition, salt water had become mixed with some of the oil before discharge at Bayonne; this mixture had to be treated to separate the oil from the salt water. As to a quantity of the mixture, such treatment was successful. As to the rest of the mixture discharged at Bayonne, the treatment was not successful; the water could not be eliminated to the extent necessary to meet commercial standards and this part of the cargo had to be sold at a price discount. Oilco asserts that the oil in this part of the cargo was emulsified with water through the action of chemicals used in tank cleaning operations wrongfully performed before the ship was entirely discharged at Bayonne and that these chemical emulsifiers were negligently permitted to mix with the cargo.

The complaint filed by Oilco on August 28, 1961 contained three separate claims.

The first claim was against the ship and her owner, Alvion. It averred that the upriver stranding was due to the negligence and incompetence of those in charge of navigating the Alkaid in that she struck "a known and charted shoal or rocky area" resulting in "loss by leakage" of cargo and additionally in water contamination of cargo. Recovery was sought (a) for the value of all cargo lost by leakage, (b) for expenses of reconditioning the water contaminated cargo, and (c) for contribution of cargo to a salvage award as a general average expense. While the wrong alleged against the ship was negligence causing the upriver stranding, damages were asked (paragraphs Ninth and Tenth) for all cargo lost by leakage, whether during the upriver stranding, during the stay

at the U. N. Building, or during the downriver stranding. This becomes of some significance to part of the claim of Oilco directly against the salvor, Merritt.

The second claim in the complaint was against Moran, its two tugs, and Pilot Valley. It averred that Moran was engaged by the shipowner to supply towage and pilotage of the Alkaid up the East River, and that Moran supplied the two tugs and its employee, Pilot Valley. The second claim averred that the damage to cargo from the upriver stranding was caused by the negligence of the two tugs or to their "insufficiency in power or inability * * * etc." or to the negligence and incompetence of Pilot Valley. Recovery was sought exactly as in the first claim.

The third claim in the complaint was against the ship and her owner. It was based on the claimed damage of cargo by emulsifiers at Bayonne and averred that this resulted from the wrongful conduct of tank cleaning operations while cargo was being discharged and from negligently discharging the tank cleaning material through cargo discharge lines, such material being thereby deposited in the same tank with cargo. Recovery was sought for the damage to that part of the cargo which had to be sold at a price discount.

Jurisdiction was duly obtained over the ship, the tugs, and the other parties defendant.

Answers were filed which put in issue the claims made.

The ship and her owner duly brought in Merritt by impleading petition under old Supreme Court Admiralty Rule 56 (it being long before the unification of admiralty and civil practice, effective July 1, 1966).

Merritt duly answered the complaint and the petition, thus putting in issue the averments of the complaint as well as those of the impleading petition.

Alvion moved in advance of trial to dismiss the first claim (that against the ship and her owner) as insufficient on its face. The position taken by Alvion was that this claim was based on negligence in pilotage and navigation, whereas the charter party specifically provides that neither the ship nor the owner shall be liable for any such negligence. The position taken by Oilco was that under the charter provision the ship was not excused for such negligence if there was "personal design or neglect of the Owner" (wording which in fact applies only to the "fire" exception) or if "caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied" (wording which in fact applies only to the "unseaworthiness" exception). Oilco also urged that the claim ought not to be dismissed before trial but that the questions raised ought to be answered after all evidence was taken. The motion of Alvion was denied by Judge Edelstein without opinion (from the Bench).

Plaintiff Oilco elected to discontinue as against Moran and the two tugs. An order of discontinuance as to them was made by the Court on the stipulation of all parties.

It is agreed by all parties that the Carriage of Goods by Sea Act of 1936 applies (46 U.S.C. § 1300 and following ("Cogsa")).

I

The Claim for the Upriver Stranding Against the Ship and Her Owner

During trial on November 1, 1966, plaintiff was permitted to amend paragraph eighth of the complaint (part of the first claim but realleged in the second and third claims). The amendment added after the words "a known and charted shoal or rocky area in the East River" the words "at the location bordered on the south by 40 degrees 40 minutes north latitude and on the north bordered by 40 degrees 45 minutes north latitude". The effect of this amendment was to indicate to some extent where in the East River the upriver stranding was claimed to have occurred.

During trial on the following day and in open Court, plaintiff was permitted to amend paragraph eighth of the complaint so that said paragraph as amended read as follows:

"EIGHTH. On or about July 15, 1960, the M. S. Alkaid arrived at the Stapleton Anchorage in the port of New York and thereafter with pilot aboard and aided by tugboats proceeded toward her destination at the dock of the Metropolitan Fuel Company, 138th Street, East River. Thereafter said vessel and its owner and operators failed to deliver said cargo in the same good order and condition as delivered to the ship upon loading, but rather was delivered short in quantity and damaged in quality as hereinafter alleged."

At the same time plaintiff was permitted to amend paragraph ninth of the complaint to eliminate the beginning words: "As a result of the occurrence described in Article Eighth". The effect of these amendments was to abandon any claim of negligent navigation as against the ship or her owner; instead plaintiff now relies solely on failure to turn out the cargo delivered.

Thereafter on the same day and when plaintiff had rested, the ship moved to dismiss the first claim, as amended. The motion was granted on the ground that the damages averred in the first claim were due either to negligent navigation or to perils of the sea and in either event the ship would not be liable under Cogsa, the charter, or the bill of lading.

Thereafter in January 1967 and before the trial had concluded, plaintiff served a written notice of a motion "for reinstatement of the first cause of action contained in the original libel as amended during the trial of this action".

Because of the possibility of confusion from the several amendments asked for by plaintiff during the trial, efforts were made to establish precisely in what form plaintiff desired its claims to be made. Finally there was agreement on the exact statement of the first claim of plaintiff, that against the ship and her owner. Counsel were notified by letter on February 2, 1967 that such would be considered by the Court as the statement of the first claim; no objection was made.

It appears therefore that the first claim against the ship and her owner is intended to be stated in principal part as follows:

"SIXTH: Thereafter and on about June 15, 1960, at the port of Mena Abdulla, Kuwait, libelant caused to be delivered to and loaded aboard the respondent M.S. ALKAID, a quantity of 22,557.055 tons of fuel oil for carriage and transportation to the port of New York in accordance with the said charter party aforesaid, said cargo being then in the quantity so stated and in good order and condition.

"SEVENTH: The quantity of 22,557.055 tons of fuel oil delivered to the M.S. ALKAID, equivalent to 150,369.27 barrels, was loaded into tanks numbered 1, 2, 4, 7, 8 and 9 center and port and starboard wing tanks and No. 5 and 6 center tanks.

"EIGHTH: On or about July 15, 1960, the M.S. ALKAID arrived at the Stapleton Anchorage in the Port of New York and thereafter with pilot aboard aided by tugboats proceeded toward her destination at the dock of the Metropolitan Fuel Company, 138th Street, East River. Thereafter said vessel and its owner and operators failed to deliver said cargo in the same good order and condition as delivered to the ship upon loading, but rather was delivered short in quantity and damaged in quality as hereinafter alleged.

"NINTH: The quantity of libelant's cargo of fuel oil which was delivered in sound condition by M.S. ALKAID was only 64,729.83 barrels as compared with the shipped quantity of 150,369.27 barrels. A further quantity consisting of an admixture of fuel oil and harbor water which

had entered the ship's tanks through the ruptured hull of ALKAID, and calculated to be 92,786.3 barrels, was discharged from the M.S. ALKAID into harbor barges or shore tanks thereafter to be reconditioned by removing the water so commingled with the fuel oil.

"TENTH: As a result of the premises aforesaid libelant has suffered damages in the loss of such quantities of fuel oil as leaked from the M.S. ALKAID the sum of $45,000.00 and has incurred expenses in an effort to recondition the 92,786.3 barrels of admixed harbor water and fuel oil the sum of $16,984,27 and has been called upon to pay cargo's proportion of salvage, general average and other expenses not as yet finalized in amount, but approximating $50,000.00, or in all the sum of $111,984.27, no part of which has been paid to libelant although duly demanded."

The question is whether the first claim, having been dismissed, is to be reinstated in the form indicated. This is not a question of pleading, nor of the burden of going forward, nor of a prima facie case, nor of the burden of proof. The trial has been concluded. All amendments to the first claim at any time asked by plaintiff have been permitted. The question now is whether plaintiff on the evidence is entitled to judgment against the ship and its owner on the first claim, as thus amended.

The motion to reinstate the first claim was considered at the trial and decision was reserved.

The first claim was originally for damages from the upriver stranding only. This appears from paragraph eighth of the complaint as filed and from the trial brief for plaintiff.

As now amended, the first claim is against the ship and her owner for all damages from loss wherever occurring. ■ It is clear from the evidence, however, that the cargo can have no claim against the ship for any loss of cargo.

Both the charter party and Cogsa itself relieve the ship from any liability for loss or damage resulting from negligence "in the navigation or in the management of the ship" or from "perils, dangers, and accidents of the sea or other navigable waters" (46 U.S.C. § 1304).

The upriver stranding resulted from either the one or the other of these causes and in neither event could the ship be liable.

■ Cogsa does require that the carrier act "properly and carefully" toward the cargo (46 U.S.C. § 1303), meaning that the carrier is liable for negligence in caring for the cargo.

■ If the upriver stranding was the result of negligence by the pilot (as Oilco asserts against the pilot in its second claim) this was clearly negligence in the navigation or management of the ship rather than negligence in caring for the cargo. Sometimes it may be difficult to distinguish between these two kinds of negligence. The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610 (1905); Knott v. Botany Mills, 179 U.S. 69, 21 S.Ct. 30, 45 L.Ed. 90 (1900); Gilmore and Black, The Law of Admiralty 134–137 (1957). See General Foods Corp. v. The Mormacsurf, 276 F.2d 722 (2d Cir.) cert. denied, 364 U.S. 822, 81 S.Ct. 58, 5 L.Ed.2d 52 (1960). The case at bar is not in this respect difficult; it is much clearer than Luria Bros. & Co. v. Eastern Transp. Co., 89 F.2d 900, 901 (2d Cir. 1937) where selecting an unsafe anchorage and failing to sound distress signals were held acts of negligence in the navigation or management of the ship, and not lack of due care toward the cargo.

Is the ship liable for anything occurring *after* the upriver stranding?

The ship did not lose speed because of the upriver stranding but some of her tanks were ruptured and, as a result, oil escaped, water came into the pumproom and elsewhere, and the ship began to list heavily to starboard. The ship continued slowly upriver but the Master soon concluded that the danger of capsizing

or sinking required that the ship be grounded out of the channel. Accordingly she was pushed still afloat alongside the seawall at the United Nations Building, port side against the wall, bow upriver, with the two tugs on the starboard side keeping her in position and to some extent counteracting the starboard list.

During the ebb tide, the ship settled on the bottom. In the morning, a representative of the owner asked assistance from Merritt, including dispatch of a salvage vessel. Shepherd, senior salvage master for Merritt, went aboard the Alkaid promptly, and talked with Captain Stange, Master of the Alkaid. Apparently the Master wanted at first to rent equipment and to have limited assistance from Merritt, but Shepherd told him that Merritt would do the whole salvage job or nothing. Shepherd had with him a form of contract but the Master refused to sign it, apparently hoping to get the ship out of its peril without the necessity of a salvage contract. About noon, a Merritt salvage vessel, the "Curb", arrived at the Alkaid with salvage equipment; Zickl, another Merritt salvage master, was in charge of the Curb. Zickl promptly came aboard the Alkaid. At about 1300 the ship floated free on the flooding tide. Shortly afterwards, the Master concluded that his only choice was to sign the salvage contract and possibly he received instructions from the owner to do so. In any event, at about 1330 the Master signed the salvage contract.

█ From the moment of execution of the salvage contract about 1330 on July 15, Merritt was in complete control of the ship. This was not specifically expressed in the contract but was clearly contemplated by it; Merritt agreed "to salve the Alkaid and her cargo" and to provide "all proper steam and other assistance and labour". It is stipulated in the pretrial order that Merritt "assumed management, supervision and control" of the ship and this is moreover established by the evidence.

Plaintiff makes no claim that the ship failed in its duty to cargo between the time of the upriver stranding at about 0230 on July 15 until the execution of the salvage contract at about 1330 on the same day. Any cargo lost or damaged in this period is conceded by plaintiff to have been due to the upriver stranding.

From 1330 on July 15 until August 10, 1960, the ship remained in the control of Merritt. During this period occurred the downriver stranding and the contamination of cargo at Bayonne, on account of which plaintiff does demand judgment against the ship and her owner.

There is no evidence that Merritt was an incompetent salvor or was known to be such. On the contrary, Merritt has had an experience of many years with salvage operations and it appears to be assumed by all parties that the reputation of Merritt in this field was good.

The ship was in peril at the time the salvage contract was executed; the Master had never been in the East River before and was unfamiliar with the tides and channels. Plaintiff states that "the original danger" had been "averted at the time she was put ashore at the U.N. Building" and further that she was not thereafter "in an emergency status". If this means that the offer of Merritt to salvage should have been rejected, plaintiff is in error. If it means that the ship was not then in such danger or peril as to be the proper subject of salvage, plaintiff is equally in error. Kennedy, Civil Salvage (4th ed. London 1950) 14–19, 21–24; Norris, The Law of Salvage (New York 1958) 97–105.

█ The situation is that, the ship being in peril, her owner (through the Master) accepted the offer of salvage of a professional salvor of good repute and turned over control of the ship and cargo to that salvor. The ship thereby discharged its duty to use due care toward the cargo.

██ Merritt was not an agent or servant of the ship but an independent

contracting salvor. There is no principle of law which would make the ship liable for any negligence of the salvor while in control of the ship. The Clarita and The Clara, 23 Wall. 1, 90 U.S. 1, 11–12, 23 L.Ed. 146 (1874); 2 Harper & James, Torts § 26.11 (1956), cited in Friendly, Benchmarks 9 (1967). The cases cited for plaintiff do not stand for any such principle. Indeed, not one of them even discusses whether a ship is responsible for the negligence of an independent contracting salvor.

In respect of the alleged damage from emulsifiers at Bayonne, plaintiff asserts that there was negligence by the owner itself, apart from the alleged negligence of Merritt. This assertion will be dealt with later.

██ There must be judgment on this first claim in favor of the defendant ship and her owner.

## II

### The Claim for the Upriver Stranding Against Clyde Valley, the Pilot

The complaint against the pilot was amended at trial and as so amended the claim is stated in principal part as follows:

"In navigating the waters of the East River to the designated destination those in charge of the pilotage, navigation, operation and control of the M.S. ALKAID, due to their incompetency, negligence and carelessness, or through acts of fault of the assisting tugs, so navigated the M.S. ALKAID as to cause, permit and allow said vessel to strike upon a known and charted shoal or rocky area in the East River at the location bordered on the south side by 40 degrees 43 minutes north latitude and on the north bordered by 40 degrees 45 minutes north latitude, thereby causing such damage to the M.S. ALKAID that certain of her cargo tanks became ruptured with resultant loss by leakage of libelant's cargo."

The issue is whether the upriver stranding was caused by negligence on the part of Valley, the pilot.

Valley started in about 1937 as a deckhand on boats in New York harbor; since about 1942 Valley has had a license from the Coast Guard as master of vessels up to 600 gross tons upon bays, sounds and rivers; since about 1943, Valley has had a license from the Coast Guard as pilot of all kinds and sizes of vessels in the waters around New York City, including the East River to Stepping Stones, a water area in Long Island Sound off Kings Point (46 U.S.C. § 224; 46 C.F.R. §§ 10.02–1(b), 10–05–17, 10.-05–39). While it does not appear from the record, I assume that Valley had a license under Article 6 of the Navigation Law of New York to act as pilot for the port of New York by way of Sandy Hook, such a license, rather than a Coast Guard license, seems to have been required. Navigation Law § 88; Anderson v. Pacific Coast S. S. Co., 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047 (1912). Valley had piloted some 60 or 70 ships of the Alkaid size up the East River by night and day. He had piloted a ship from 138th Street down the East River about a month before and about three or four months before had piloted a ship with a 33 foot 6 inch draft up the East River to 138th Street (as will shortly appear, this was a deeper draft than the Alkaid). Valley had been going up and down the East River since 1942. He testified that he was thoroughly familiar with the waters and shore marks in and along the East River. He was employed as a pilot by an organization called "Reynolds Pilots" and had also been employed for five years by Moran as master of the tugboat Eugene F. Moran, apparently operating at all times in New York Harbor.

The Alkaid was of Panama registry. She was built in 1953 in Amsterdam. She was 603 feet long. She had 27 cargo tanks; there were nine large tanks down the center, nine smaller "wing" tanks down the port side, and nine such wing tanks down the starboard side; the tanks were numbered from 1 to 9 beginning at the bow.

As she arrived at New York Harbor, wing tanks 3, 5 and 6 on port and starboard sides were empty and the two wing tanks 7 had a small amount of cargo. Her weight was 30,267 long tons (22,557 tons of cargo and 7,710 tons light weight of the ship). Her draft was 30 feet 8 inches forward and 30 feet 4 inches aft.

The Master of the Alkaid, Karl H. Stange, was a German who had been going to sea for almost 25 years and was licensed as a Master. The crew was principally German.

Alerted by the New York agent of the ship, two tugs met the Alkaid at about 0100 on July 15. One of the tugs was the Eugene F. Moran, of which Valley was master. At about 0130 Valley boarded the Alkaid and assumed duty as pilot; Cummings was left on the Eugene F. Moran as acting master. Before boarding, Valley had satisfied himself of the draft of the Alkaid.

At about 0140 the Alkaid and the two tugs left the anchorage to go up the East River to East 138th Street. At all relevant times, there was a clear and blue sky, the visibility was good, and there was little or no wind.

The United States Coast and Geodetic Survey (the "Survey") annually publishes "Tide Tables" containing high and low water predictions, both as to times and heights, for each day of the following year. The heights are given in feet above mean low water, the datum of soundings on nautical charts of the area.

The Survey operates a control tide station at The Battery in New York. At this station records are made of the observed times and heights of high and low water. As a result of past tidal observations at other points in the East River (including East 19th Street, Manhattan side), correction factors have been established for computing tides at these other points from observed tides at The Battery. These correction factors are published in "Tide Tables".

■ The Survey has certified to the Court its observed tides at The Battery on July 15, 1960. The Court takes judicial notice of this information and of the correction factors for other points.

High tide at The Battery on July 15 was at 0212 and the water at that time was 5.2 feet above mean low water.

High tide at East 19th Street (Manhattan side) was at 0314 and the water at that time was 4.9 feet above mean low water. East 19th Street is about opposite India Street on the Brooklyn side.

The ship passed under the Williamsburg Bridge, one tug hanging on at the port bow and the other at the starboard bow. The tug at the starboard bow was the Eugene F. Moran, with Cummings in command. Valley was choosing the course by landmarks and not by compass.

Shortly after passing under the Bridge, the ship struck something in the water and began losing cargo but the striking did not affect the speed of the ship. The relevant entry made immediately in the ship's log was as follows:

"(0233 ship touches ground and starts listing and considerable quantities of oil getting out".

The chief issue of fact is the location of the ship when she struck something.

Plaintiff asks for a finding that the ship struck the bottom of the river and therefore must have been in water less than 30 feet 8 inches deep (the maximum Alkaid draft at the time), where (it is said) she could only have gone through negligence of the pilot. Plaintiff recognizes that it is unable to show by "direct evidence" where the ship stranded but suggests "many spots inside the Manhattan 5 fathom line", other "such spots inside the entrance" to Newtown Creek, and another spot within the 5 fathom line south of North 1st Street on the Brooklyn side.

Defendant Valley insists that the ship was in the channel in water much deeper than 30 feet 8 inches and therefore must have hit an "uncharted, unknown, and transitory object", such as a rolling boulder or a concrete pipe.

News of the upriver stranding was given from the Alkaid to the Coast Guard and to Moran, by whom it was relayed to the Army Engineers and to the ship's agent.

At 0830 on July 15 the Engineers heard from the Coast Guard, from Moran and from others that the Alkaid had "struck an obstruction on the east Poorhouse Flats Range about opposite India Street".

■ A "range" is a direction line indicating the channel or recommended route for travel. The Poorhouse Flats Range is marked on the Survey maritime chart for the East River and is above the Williamsburg Bridge beginning just below Bushwick Inlet. The direction line is shown by two fixed range lights, or "leading lights", maintained on the Brooklyn shore. One range light is red and the other is green; the green light is behind and some 20 feet above the red light. When the two lights are seen from the river at the same time, one directly behind the other, the line is established. The range lights are thus designed to keep a ship in the channel and if the ship "stays on the range" it should not "get into any trouble". On the Manhattan side, a tall stack north of East 35th Street as well as the Chrysler Building are in a continuation of the line of the range; both are lighted at night.

As soon as the Engineers heard of the accident on the morning of July 15, they began a sweep and survey of the channel in the area of the Poorhouse Flats Range to see if they could find any obstruction. They governed their sweep and survey by the location where they understood the Alkaid had struck, namely, on the Range about opposite India Street.

When Shepherd from Merritt boarded the Alkaid about 0930 on July 15 he was told by the Master that the ship "had struck a submerged object".

At 1430 on July 15, the Engineers at New York sent a message to the Chief of Engineers in Washington reporting among other things that the Alkaid had "struck alleged submerged object in East River off India Street, Brooklyn".

At 1630 on July 15, the sweep and survey were completed. They had covered an area in the East River from about opposite Noble Street on the south to about opposite the entrance to Newtown Creek on the north and from 150 feet east of the range to 300 feet west of the range. They swept to a depth of 31 feet below mean low water and also used a fathometer. Nothing was found.

On July 17, the Master sent a short report of the accident to the owner. This report contained the following statement:

"Estimated time at place of accident 0240 hr. Vessel grounded at 0233.

Vessel was in line of the leading [range] lights."

On July 19, the Coast Guard conducted an investigation of the accident under 46 U.S.C. § 239.

Valley testified on July 19 that after passing Williamsburg Bridge he was heading the ship slow speed to the north corner of the Milton Street pier, that the North 1st Street pier was 150 yards to starboard as the ship passed, that at a point slightly south of the red range light and about 260 yards to its left he had the ship turned "port easy", that at a point about 50 yards left of the range where the two range lights could be seen but not yet in line he gave the order "midships" and that when the ship was pointing for the tall stack north of 35th Street on the Manhattan side he gave the order "steady as she goes" and the ship steadied on course. Valley testified that when the ship was about off India Street it struck something in the river. Valley marked on a chart the place where he was "positive" the ship struck; the place is over a sounding of 39 feet, slightly to the left of the range, 262 yards from a point about midway between the pier ends on India and Huron Streets on the Brooklyn side and about opposite East 20th Street (Pier 63) on the Manhattan side.

If when it struck something the ship was in fact at the place where Valley thus testified that it was, it could not possibly have struck the bottom because the water level there was well over 39 feet above the bottom (39 feet on the chart at mean low water plus the additional water (using the data for East 19th Street)) due to a flooding tide, which would become high tide some forty minutes later; the ship's draft was 30 feet 8 inches.

Valley further testified on July 18 that the moment the ship struck he asked the Captain to take a visual bearing check immediately, that they both did so at once, that the ship was "approximately perfectly" on the range lights behind and "dead on" the tall stack north of East 35th Street ahead on the Manhattan side, that she was a little north of the India Street pier on the Brooklyn side and beteen pier 68 (East 20th Street) and pier 69 on the Manhattan side. He said that the ship lifted at the bow a little and felt "like something was rolling underneath it"; he felt "the scraping and rolling under the ship".

The testimony of Valley at the Coast Guard hearing three days after the accident was fully confirmed at the same hearing by the testimony of the Master of the Alkaid. While that testimony was not made part of this record, the chart was received in evidence on which Captain Stange on July 19, 1960 marked the place of the upriver stranding. A comparison of the chart marked by Valley with that marked by Stange shows that they both marked exactly the same place as the point of striking for the upriver stranding.

Cummings, who was acting captain of the starboard tug on July 15, also testified at the Coast Guard hearing. While his testimony at that time is not in evidence here, it must have confirmed the testimony of Valley and Stange as to the place of striking because Cummings testified at trial and was not contradicted in any significant respect by use of his Coast Guard testimony on cross-examination.

Plaintiff was represented at the Coast Guard hearing, as was also the ship. There was no discrediting or impeaching cross-examination of Valley and, so far as appears, none such of Stange or Cummings.

Stange testified in this action by deposition taken at Port Allen, Louisiana, on August 28, 1962. He was at that time still Master of the Alkaid. His testimony fully supports Valley. Stange testified that after passing the Williamsburg Bridge there was "a normal port maneuver", that shortly afterwards he felt a "vibration in the feet" and heard "a little noise", that the U.N. Building was ahead of them to starboard, that he called to Valley: "Pilot, we are aground * * *", and that Valley answered: "That is absolutely impossible; please have a look, we are right on the line". According to Stange, he then looked aft and saw that "the vessel was right on the line and in the range"; he saw the red and green range lights; and Valley called out the names of the piers they had just passed on the Brooklyn side and on the Manhattan side. Stange again marked on a chart the place of the striking; it is almost exactly the same place which had been marked by him and Valley two years before. On cross-examination, Stange insisted that his ability to fix the place of striking was because he verified with his own eyes that they were on the range and the pilot called out the piers on either side, thus producing an "accurate fix". Stange described the striking as "a walking obstruction", "walking like a tin opener", and said that it felt as if something was rolling under the ship's bottom.

Valley at a deposition taken on September 9, 1963, and at trial, gave substantially the same testimony as at the Coast Guard hearing three days after the accident.

Cummings was also an eye witness, on the starboard tug. He had been brought up in Greenpoint, in the area near the piers on the Brooklyn side above the

Williamsburg Bridge. He had been going up and down the East River on tugs since 1931. On the trip upriver on July 15 he had no responsibility, because the tug was being towed along and he did not have to steer or do anything else. He heard "a rumbling, a ripping" from the bottom of the Alkaid, then looked aft and saw the range lights which "seemed to be closed", that is, in line. The ship was then "abreast of India Street" on the Brooklyn side and about off pier 68 on the Manhattan side. The testimony of Cummings supports that of Valley and Stange.

It is suggested for plaintiff that Valley, Stange, and Cummings were interested witnesses at the time of the Coast Guard hearing because they "all faced loss of their respective licenses if the Coast Guard found them inattentive to duty or otherwise negligent in the premises". As to Valley, this can be accepted as true, although the July 18, 1960 hearing was investigative only, under 46 C.F.R. Part 136, and was not a suspension and revocation proceeding under C.F.R. Part 137. The suggestion is certainly not true as to the two others. Cummings could not possibly have been charged with any fault, having had no responsibility at the time. Stange could not have been charged with fault because the responsibility for piloting was solely that of Valley; moreover, the licenses held by Stange were issued by Germany and could not have been revoked by the Coast Guard (46 C.F.R. § 137.01-30(a)). It is also noted that Valley was represented by counsel at the Coast Guard hearing but not Stange and Cummings, neither of whom seem to have been found a "party in interest" (46 C.F.R. § 136.03-10).

It would further seem that Stange would have every interest and motive for blaming the pilot, if any fault could possibly be laid to him. Stange needed no excuse, either for his owners or for anybody else. Stange had never been in the East River before and had turned over the piloting entirely to Valley. If he could hold Valley or Valley's employer responsible, concern for his ship would impel him to do so.

Under the circumstances, the testimony of the three eye witnesses must be accepted. The fact that it is consistent with the very first reports of the accident gives it added weight.

The ship was therefore in a proper part of the channel. It is impossible to say what she struck; a number of possibilities are suggested by counsel for Valley; apparently there have been a number of reported strikings in the New York water area when the object struck could not be found by a sweep and survey. Having been in a proper part of the channel, it is not necessary to speculate about what the Alkaid struck early on July 15.

The decision closest on its facts to the case at bar seems to be Gypsum Packet Co. v. Horton, 68 F. 931 (S.D.N.Y.1895) where a libel against a pilot for negligent stranding was dismissed. The decision in *Gypsum Packet* was by Judge Addison Brown of this Court, said to have been a "distinguished Judge who did so much to mold and develop American maritime law * * *." The Noah's Ark v. Bentley & Felton Corp., 292 F.2d 437, 441 (5th Cir. 1961).

Another decision where no negligence was found on facts reasonably close to those in the case at bar is Guinan v. Boston etc., Canal Co., 1 F.2d 239, 244–246 (2d Cir. 1924).

Even if the testimony of the three eye witnesses was rejected, the result would be the same because in that event there is no evidence sufficient to enable a finding to be made as to where the ship was when she struck. Plaintiff would thus have failed to sustain its burden of proof that Valley was negligent. United States v. Soriano, 366 F.2d 699, 706–709 (9th Cir. 1966).

There must be judgment on this claim in favor of defendant Valley.

### III

**The Claim for the Downriver Stranding Against the Ship, Her Owner, and the Salvor**

The claim for cargo lost because of the downriver stranding is not separately stated or numbered in the complaint. While the first claim as filed was based only on the upriver stranding, damages were asked for all cargo not delivered. When the first claim was amended at trial it was broadened so as expressly to state a claim for all cargo not delivered, no matter where or when it was lost.

As already noted, the ship brought in Merritt by impleading petition under the old practice. This impleading petition averred in substance that if any cargo was lost by leakage or was damaged, it was the result of the negligence of the salvor Merritt in navigating the ship, in discharging its cargo, and otherwise in performing salvage. Four specific instances of negligence by the salvor were averred: (1) causing the downriver stranding, (2) causing bottom damage during that stranding, (3) causing loss of cargo by rupturing tanks which caused leakage and by intentionally discharging cargo during the downriver stranding, and (4) causing emulsification from chemicals used in tank cleaning operations at Bayonne. The petition prays that Merritt "be proceeded against as if originally made a party herein" and that, if Oilco is entitled to a decree, such decree be entered against Merritt.

Merritt answered both the complaint and the impleading petition.

For reasons already given, the ship and her owner cannot be held responsible for cargo lost during the salvage operations through negligence of the salvor.

However, under old Supreme Court Admiralty Rule 56 and under present Fed.R.Civ.P. 14(c), plaintiff may properly assert a claim directly against Merritt: "the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff" (Fed.R.Civ.P. 14(c)).

The pretrial order made it clear that plaintiff was claiming directly against Merritt for the downriver stranding. This was also made clear at the opening of trial. In any event, the claim against Merritt for the downriver stranding was litigated and will be considered on the merits.

As already noted, the ship continued on its course after the upriver stranding until her Master decided to beach her and she was pushed still afloat against the seawall at the U.N. Building; she was held there by the two tugs. The ship's log shows that at 0305 "tugs . . . push ship shoreward aground" and at 0318 "vessel alongside UN Building". Valley confirmed the time in testimony that the ship was pushed against the seawall at the U.N. Building at about "0310 or 0320".

High tide at East 41st Street (near the U.N. Building) was at 0332 on July 15.

During the ebb tide the ship settled in the water until it rested on the bottom. Low tide was at 0950.

The next high tide at East 41st Street on July 15 was at 1614 and on the flooding tide the ship floated free at about 1300. The current was "very high", between four and five knots.

Merritt was in control of the ship from 1330 on July 15.

Shepherd was the senior salvage master for Merritt. He had started going to sea as a boy, had come up through the engine room to chief engineer and had a license for that position. He had no navigating experience and had never been master of any vessel. He had years of salvage experience.

Zickl was the other salvage master for Merritt. He also had gone to sea as a very young man, worked up through deck offices, secured a master's license, acted as master, then went to Merritt and worked many years on salvage vessels and doing salvage. Zickl also had a pilot's license.

On board the Alkaid before the salvage agreement was signed at about 1330 on July 15, the two salvage masters had determined that "if the tugs were successful in holding the ALKAID on the approaching flood tide, they would endeavor to secure the vessel in her present position by planting beach gears from the bow and stern, until relieved of her starboard list and her buoyancy restored by application of compressed air to her starboard wing tanks". In short, the first decision was to apply compressed air to the starboard tanks at the U.N. location and thus to reduce the draft before moving the ship downriver.

After the ship floated free about 1300, Shepherd discussed with the Master, Stange, and with the pilot, Valley, what should be done with her. She had a list of about 15 to 20 degrees to starboard and a draft of from 42 to 45 or 46 feet; according to Valley, Shepherd told him that the draft was "over 46 feet". It was difficult to know her draft exactly because the draft marks were under water but Valley testified that the draft was 45 feet six inches. A third tug had arrived to assist.

Shepherd wanted to take the ship back down the river; Stange insisted that before doing so they should "righten up" the ship and reduce her draft.

The three men looked at a Survey chart of the East River which must have been brought on by Shepherd or by Zickl. Valley had not brought any chart and while the ship had a "general chart" it was not "usable for navigation".

Valley pointed out from the chart that with her then draft the ship could not get past Grand Street (on the Brooklyn side, above the Williamsburg Bridge) on a flood tide or on any other tide because there are "shallow spots all along through there" and the ship would "go aground". Valley testified at trial that he told Shepherd "it was possible with a wing and a prayer" for the ship to get through.

Captain Stange continued to urge that the list of the ship be corrected and her draft reduced before trying to go downriver.

Shepherd decided, however, to go downriver with the ship in her then condition and if she went aground to reduce her draft and take other salvage measures at that time and place. In this connection, the parties have stipulated in the pretrial order to the following state of facts:

"As soon as the Salvage Agreement was executed by both parties, Merritt-Chapman and Scott Corporation undertook the performance of salving the ship and cargo under the direction of Captain F. A. Shepard who directed that the M/S ALKAID with a draft of about 45 feet and a starboard list of about 15° should be brought downstream with the assistance of four tugs operated by the respondent, Moran Towing & Transportation Co., Inc. Prior to commencing the downriver voyage with the disabled M/S ALKAID, the salvage master reviewed the appropriate United States Coast and Geodetic Survey chart for the area in the company of the pilot, respondent Clyde Valley and the master of the M/S ALKAID, both of whom advised the salvage master that in its then present condition, the M/S ALKAID would ground on the bottom of the East River prior to passing the Williamsburgh Bridge. Merritt-Chapman and Scott Corporation, the respondent-impleaded herein, elected to commence bringing the disabled M/S ALKAID downriver on the ebb tide."

Shepherd said in his testimony that it would have been "unsafe" to transfer compressors from the Curb to the Alkaid before leaving the U.N., presumably because of the flooding tide. There is nothing to support the opinion and it is contrary to the first decision reached. It was possible to pull the ship downstream, stern first, against the flooding tide. Surely with beach gear and three tugs it would have been possible to hold the ship where she was, until her draft could be reduced; indeed Zickl recorded

that "three Moran tugs then held the Alkaid in position until more tugboat assistance could arrive on scene". Moreover Shepherd reported that the ship "now appeared reasonably stable with a list of about 18 degrees and her draft estimated at about 42 feet. Under the circumstances, rebeaching of the vessel was deemed *unnecessary* and movement to another location feasible" (emphasis supplied).

Beginning about 1400, the ship was towed downstream, stern first, against the flooding tide (high tide at East 41st Street was at 1614 and at North 3d Street, Brooklyn, was at 1549). A fourth tug assisted.

About off Milton Street (Brooklyn) the ship was turned around so that she could go down bow first and be able to use her engine and rudder.

About 1540 the ship ran aground. The entry then made in the ship's log was:

"1540 Vessel run aground, 'Federal Business Products Building' abeam".

The Federal Business Products Building is at 184 Kent Avenue, on the Brooklyn side between North 3d and 4th Streets; as Stange testified, "it was nearby to where the ferries took off railroad cars", these piers being to the north of North 4th Street.

As noted, the ship grounded about 1540. High tide at North 3d Street, Brooklyn—a point *fairly near* to where the ship must have been—was at 1549, at which time and place the water was 4.8 feet above mean low water.

The ship grounded forward of the bridge on the starboard side and she then was turned around by the tugs and by her own engine "like on a pinpoint"; this made a hole in starboard wing tank 2 and one could hear "the breaking of the shells in the aforeship" and "the break of the rivets". Stange protested any turning maneuvers but Shepherd asserted his authority; finally, at 1715, Stange himself stopped the ship's engines and any efforts to float the ship by turning were ended.

After Stange stopped the engines at 1715, Shepherd turned to putting air pressure in the starboard wing tanks (the first plan at the U.N. Building). The ship's equipment proved insufficient and two air compressors were transferred to the Alkaid from the salvage vessel Curb. Stange told Shepherd not to put air pressure on any tanks with cargo. According to Stange, air pressure was in fact applied to cargo tanks. I find, however, that the only cargo tank to which air pressure was applied during the downriver stranding was starboard wing tank 7.

After air pressure had been built up in empty starboard wing tanks 3, 5 and 6 and in starboard wing tank 7, the list diminished and at 2245 the ship was afloat. Low water at North 3d Street, Brooklyn, had been at 2200. When she came afloat, the ship had a draft of about 36 feet. The reduced draft enabled her to be towed downriver and to an anchorage off Tompkinsville, Staten Island.

It is difficult—and fortunately not necessary—to determine on the chart the precise point of the downriver stranding. Stange marked the place on a chart at the Coast Guard hearing on July 18, 1960; this is a point on the chart offshore from between North 4th and 5th Streets on the Brooklyn side, slightly west of a marking "SG" and in water with soundings (at mean low water), in a clockwise direction, 52 – 57 – 44 – 40. Nearby are sounds of 36, 37 and 38. At his deposition on August 28, 1962, Stange also marked on a chart the place of the downriver stranding; this is substantially the same point, very slightly north of the place first marked and between soundings 40 – 52. Valley placed the downriver stranding at a point off the pier at North 1st Street (Brooklyn side), somewhat south of the point indicated by Stange and in an area with soundings 55 – 68 – 62 – 37.

Of course, with a draft of 45 feet or more, the ship would strand even at high water wherever the chart showed

soundings of 40 feet or less (at mean low water).

The downriver stranding was inevitable when the ship left the U.N. location without any reduction of her draft. It seems clear that ordinary prudence required a reduction of the draft by use of compressed air before the ship was allowed to ground and to suffer further damage. Captain Stange urged this and the warnings of the pilot implicitly advised it; Shepherd himself had first decided on this procedure.

■ Thus, any loss of cargo from the downriver stranding was caused by the negligence of the salvor in taking the ship to an area where she was certain to ground.

■ A salvor is liable for distinguishable independent damages caused by his ordinary negligence, that is, a failure to use reasonable care. The Noah's Ark v. Bentley & Felton Corp., above, 292 F.2d at 440–441; The Cape Race, 18 F.2d 79, 81 (2d Cir. 1927). The authorities are collected in a dissenting opinion of Chief Judge Biggs (joined by Judge Goodrich and Judge Staley) in P. Dougherty Co. v. United States, 207 F.2d 626, 642–650 (3d Cir. 1953), cert. denied, 347 U.S. 912, 74 S. Ct. 476, 98 L.Ed. 1068 (1954). See also Norris, The Law of Salvage 205–212 (1958); Gilmore and Black, Admiralty 459–460 (1957). It may be added that the principle is recognized by counsel for the salvor.

■ Despite the finding of negligence by the salvor, there can be no judgment for plaintiff because (a) no cargo was lost during the downriver stranding and (b) even if cargo were lost, such cargo would have equally been lost had compressed air been applied before leaving the U.N. Building.

The only cargo tank to which air pressure was applied during the downriver stranding was starboard wing tank 7. That tank when loaded had an "ullage" of 37 feet 5 inches. Ullage is the distance from the oil level in a tank to the top of the tank; it is a measure of the empty space in the tank. The cargo tanks of the Alkaid on an average were 42 feet deep. This means that when loaded in the Persian Gulf there was oil in that tank to a depth of 4 feet 7 inches. When the tank was ruptured by the upriver stranding, water entered the tank and such of the cargo oil as was not lost was forced upward in the tank, oil and water not mixing and oil having a lower specific gravity than water. Oil is lighter than water and will float on top of the water. At the time of the downriver stranding, therefore, that tank had a maximum of 4 feet 7 inches of cargo oil above 37 feet 5 inches of water. As Stange testified, the water flowing into the starboard tanks "pressed the cargo under the deck". Uncontradicted evidence for the salvor was that one pound of air pressure applied to a ruptured tank forced about two feet of liquid down and out through the rupture. About four pounds of air pressure was put on starboard wing tank 7, which would have forced 8 or 9 feet of water out through the rupture, leaving in that tank 28 or 29 feet of water below a maximum of 4 feet 7 inches of cargo oil; it is evident that no oil was forced out.

■ It was thus physically impossible for any cargo oil to have been lost during the downriver stranding.

Three employees of the salvor (Shepherd, Zickl and Hauge) testified that a special watch was kept during the downriver stranding for any escaping oil and that no oil was lost.

A disinterested witness strongly supported this testimony. Nelson was chief boatswain's mate on the Coast Guard Cutter Sauk in New York Harbor on July 15, 1960. That vessel was on patrol with the Alkaid during the entire time from leaving the U.N. Building, through the downriver stranding and until the Alkaid arrived at the anchorage. The Coast Guard crew of the Sauk was charged, among other things, with the specific duty of observing for oil pollu-

tion and reporting any such to the captain of the port. The Alkaid was kept under observation at all times during the downriver stranding, with searchlights. Nelson testified that no oil escaped from the Alkaid.

It is true that Captain Stange testified to "very heavy" loss of cargo oil during the downriver stranding and estimated 300 tons lost. The captain must have been mistaken, perhaps confusing surface oil on the water remaining from that earlier lost whereas cargo oil forced out by air pressure bubbles up in heavy lumps, "like a basketball, and breaking the surface and spreading out".

But even if cargo oil were lost during the downriver stranding, this would not be proximately caused by that stranding but by the upriver stranding. The draft of the ship had to be reduced by applying air pressure to the starboard tanks. This should have been done before the ship left the U.N. Building but whenever and wherever done, the result in cargo lost would be exactly the same. The salvor cannot be criticized for its selection of four starboard tanks for air pressure, three empty tanks and one with very little cargo oil.

There must be judgment on this claim in favor of defendants, the ship, her owner, and the salvor.

IV

The Claim for Emulsifying Part of the Cargo at Bayonne

In the complaint as filed there was a claim against the ship and her owner for alleged damage to oil at Bayonne from emulsifiers. It was averred that the ship discharged her remaining oil cargo (some contaminated with water) into shore tanks at Bayonne, that during such discharge cleaning operations were conducted in some of the tanks, that the cleaning water and detergents (emulsifiers) were negligently pumped ashore through the same lines as were used for the cargo oil being discharged, that the cleaning water and detergents were put in the same shore tanks as the cargo oil, and that there was such an emulsification that the cargo oil could not be separated out from the water to an acceptable condition. Plaintiff avers that this affected a large quantity of oil, which plaintiff had to sell "at a greatly depreciated value", and that plaintiff moreover had substantial expense in attempting unsuccessfully to recondition the oil.

The impleading petition of the ship and her owner averred that, if there was any mingling of cleaning detergents with the cargo oil discharged at Bayonne, this was done by Merritt.

Merritt answered the complaint as well as the impleading petition; the answers were in substance a denial of the averments as to its responsibility for any emulsifying at Bayonne.

Plaintiff is asserting a claim not only against the ship and her owner for the alleged emulsification at Bayonne but is also asserting the same claim directly against the salvor.

In a general sense oil can be "contaminated" by many substances. In this proceeding, reference in the testimony and records to "contaminated oil" has often meant oil contaminated by sea water. To avoid confusion, the alleged damage to part of the oil from emulsifiers at Bayonne will not be called a contamination; the word "contaminated", if used, will refer only to water contamination.

A. Beginning Discharge
at Bayonne

After her misadventures in the East River, the ship arrived at an anchorage off Staten Island early on July 16. She left this anchorage early on July 20 and arrived off the area of the Bayonne Terminal Warehouse Corporation (Terminal) in Bayonne, New Jersey, early on the same morning. Captain Zickl was the salvage master in charge and remained as such for all the relevant later period. The Alkaid tied up on the west side of Pier No. 1 of Terminal, the ship's bow inshore. This pier extends into the Kill Van Kull, which is a relatively nar-

row waterway between Staten Island on the south and Bayonne on the north, running westerly from upper New York Bay. The pier ran from north on the Bayonne shore due south into Kill Van Kull.

In the Terminal area there were some 200 storage tanks for oil, connected by pipelines operated by a pumproom. The tanks were divided into six yards. Each tank was numbered, the first digit indicating the number of the yard. There was also an open pond, adjacent to a small waterway leading to Kill Van Kull; this pond was called a slop pond or separating pond and was used primarily for slop discharge from barges. (The word "slop" normally means worthless material such as water with chemicals, etc.; but Zickl also used "slop" to refer to water contaminated oil and called the tank into which most of such oil was discharged the "slop tank".)

The ship had a number of pipelines through which cargo was discharged. One of these lines on the starboard side could not be used at Bayonne because of damage. The tanks served by this line were pumped by air pumps into other tanks and discharged through operating cargo pipelines. There was at least one manifold on the ship through which the pipelines discharged.

On the pier there were two Terminal pipelines, one to the tanks for Cargo and one to the slop pond. One or the other of these lines was connected by Terminal employees to the ship's manifold; only one line was used at a time. After material entered a Terminal pipeline it was controlled and pumped by Terminal.

The discharge from the Alkaid was checked and verified by E. W. Saybolt & Co., Inc., a well known firm which acted as "inspectors of petroleum". A Saybolt employee was always on duty at the pier and, among other things, took samples every half hour of the material coming ashore from the ship.

The first cargo discharged was that containing little or no water. Discharge of this oil began at 1115 on July 20 and finished at 2300 on July 23. This oil was sent to tanks 4432 and 4433.

### B. Tank Cleaning on the Alkaid at Bayonne

Before the ship had reached New York Harbor on July 14, her owner had employed a company to clean her tanks after her discharge at New York, since her next cargo was to be grain. The tank cleaning company was in Texas and was owned and operated by Lyday, a resident of Texas who had cleaned the Alkaid and done other work for the shipowner before.

Oil tanks are cleaned in several steps. A chemical is first sprayed on all the interior surfaces; this chemical is an emulsifier, sometimes called a detergent. The purpose of the detergent is to make the oil soluble so that it will not stick to the metal surfaces but will come off easily. Next, steam is put into the tank because when the oil and chemical are heated, there is a better chemical reaction and the mixture comes off the surfaces quicker and easier. Next, machines are put into the tank; these machines have double opposed nozzles which revolve, in the manner of a lawn sprinkler, and throw hot water at high pressure over all the interior surfaces. The machines are called "butterworth" machines and the word "butterworth" is used as a verb to indicate this type of cleaning. Cold sea water is drawn into the ship, then heated, and sent through special butterworth lines to the butterworth machines. While the machines are spraying there are no men in the tanks and the tanks are closed. The leavings in the bottom of the tank, butterworth slop, are drawn off and discharged from the ship through the ordinary ship's cargo lines and should be drawn off while the butterworthing is being done. Normally butterworthing is done at sea where discharge of the butterworth slop does not create a water pollution problem. After butterworthing, the ship's cargo lines must be cleaned, by steam or by sea water, be-

fore any cargo oil is sent through the lines; otherwise the cargo oil would be tainted by the leavings of the butterworth slop in the lines.

There should never be any butterworthing while the ship is loading or discharging oil because of the obvious danger of tainting the oil.

It was contemplated that the cleaning of the Alkaid's tanks would be done after leaving New York during the voyage to pick up the grain cargo. Lyday and his two foremen came from Texas to New York to meet the ship.

Then came the damage to the ship in the East River and her berthing to discharge at Bayonne, before going into dry dock.

The owner decided that Lyday should go ahead and clean the tanks before the ship went to dry dock; this may have been because of the expense in bringing the cleaning men from Texas or because it got the ship into dry dock faster or both.

Lyday began his cleaning operations on Monday, July 25. At all times he cleaned only in those tanks designated for the purpose by Zickl, the salvage master. Representatives of the owner were on the ship at some time each day while cleaning was going on.

On Monday, July 25, Lyday put steam and chemicals in center tanks 6, 7 and 8 and port tank 8.

On Tuesday, July 26, Lyday butterworthed center tanks 5 and 6 after chemicals had been put in those tanks.

On Wednesday, July 27, Lyday put chemicals in center tank 8 and port tanks 8 and 9; on the same day he butterworthed those tanks. This began at 0800 on July 27.

The rest of the cleaning is irrelevant to any issue here.

The chemicals used by Lyday on July 25, 26 and 27 were emulsifiers.

The leavings from the cleaning in the tanks indicated were not immediately pumped ashore but accumulated in the tanks and were later pumped into shore tanks in the period from 1200 on July 27 to 1300 on July 28.

The findings made as to cleaning on the Alkaid are based in large part on contemporary records, the Lyday log and the ship's log which were confirmed by the notes made by Zickl. These records are much to be preferred to any current contrary testimony.

### C. Completion of Ship's Discharge; Emulsification of Part of the Cargo

The sound cargo having already been discharged, Terminal made available tank 5801 to receive oil contaminated with water to a substantial degree. At 1440 on July 24 discharge to shore tank 5801 commenced from ship's port tank 7. Discharge from port tank 7 was completed at 1745 on the same day. Then there was discharge from center tank 1, followed by discharge from port tanks 3, 6 and 5 in that order. All this went to shore tank 5801. Discharge stopped at 0600 on July 25.

The ship resumed pumping ashore to tank 5801 on the same day, July 25, at 0740 and continued to 1245, resumed again at 1425 and continued to 2125, all on July 25. This discharge came from port tank 3 into which the ship had transferred cargo from center tank 2.

On July 26 from 0800 to 2000 the ship discharged from center tank 1, center tank 2 (via port tank 3) and from port tank 3 itself. This discharge was to shore tanks 3815 and 3816. Discharge had to be stopped at 2000 on July 26 because the shore tanks were full. It was necessary to wait for water to drop to the bottom of the shore tanks, where it could be drawn off.

Meanwhile, from other piers of Terminal four barges with contaminated oil cargo (from port and starboard tanks 1 and 2 of the Alkaid) had been discharged into shore tanks 5801, 3815 and 3816. This cargo had been transferred to the four barges while the Alkaid was at the Staten Island anchorage.

From 1250 to 1620 on July 24 Barge B–60 had discharged to shore tanks 3815 and 3816.

From 1745 on July 24 to 0415 on July 25, Barge Seaboard 22 discharged to shore tank 5801.

From 0855 to 1930 on July 25, Barge Hygrade No. 6 discharged to shore tank 5801.

From 1125 on July 25 to 0950 on July 26, Barge Rangeley discharged to shore tank 5801.

At 1200 on July 27 discharge to shore tanks from the ship resumed and continued until 1300 on July 28. The discharge was from ship's port tank 3 and from center tanks 4, 5, 6, 8, 9 and 7 in that order.

It has already been noted that chemicals and other butterworth slop had accumulated in center tanks 5, 6, 7 and 8 from the cleaning operations of Lyday before 1200 on July 27. Therefore, when these tanks were pumped ashore in the period beginning at 1200 on July 27, the emulsifying chemicals went into a tank or tanks ashore. It is important to establish into what tank or tanks these chemicals were introduced.

The evidence is not satisfactory in this respect. The Saybolt report simply states: "1200 started pumping ashore". There is no designation of a shore tank or tanks. But a record of Terminal made at the time states that discharge started to tank 5801 on July 27 at 1145. The Zickl log states that at 1150 on July 27 pumping was resumed "ashore into slop tank"; as already seen, Zickl referred to tank 5801 as the "slop tank". The Saybolt report states that at 0810 on July 28 "stopped discharge—lack of room ashore" and that at 0830 "started to butterworth slop ashore to slop pond". Except for this last entry itself, there is no evidence that in this period (that is, after 1200 on July 27) anything was pumped from the ship to the slop pond. The entry is contrary to the fact and, since it appears in a report dated September 27 (when it was known that a foreign agent had been introduced into tanks 5801, 3815 and 3816), may have been meant to be exculpatory.

Lipari, in charge of the Bayonne office of Saybolt and of their work on the Alkaid discharge at the pier of Terminal, testified that there came a point on July 28 when 5801 was full, that the discharge was then diverted to 3815 and 3816, that these two tanks became full, that the discharge was then stopped, that at that point he telephoned the ship's agent and said that there was so little oil on the ship that the discharge to the shore tanks was almost all water, and that it did not pay to continue. The ship's agent agreed that discharge of cargo should be stopped and, according to Lipari, "at that point it was all over". "That point" was at or near 1300 on July 28. An entry in the ship's log for 1300 on July 28 is: "finished pumping slop ashore." The salvage report of Merritt states that at 1515 on July 28 "operations for discharge of vessel's cargo were completed * * *". The pumping into shore tanks 5801, 3815 and 3816 must have stopped at 1300 on July 28.

The evidence is that as late as August 9 the mixture in tank 3815 contained 8% water at the top and the mixture in tank 3816 contained 3.8% water at the top. This meant that some agent in the mixture in the two tanks was preventing the normal separation and dropping out of the water from the oil, just as with tank 5801. The fact that there was such an agent in the three tanks is itself evidence that they each received part of the discharge from the ship in the period from 1200 on July 27 to 1300 on July 28.

On all of the evidence it must be found that from 1200 on July 27 to 1300 on July 28 material containing emulsifying chemicals was discharged from the ship to shore tanks 5801, 3815 and 3816.

#### D. The Ship's Emulsion Theory Cannot Be Accepted

It is suggested for the ship (and her owner) that if an emulsifier was sent to

any shore tanks in the discharge from the ship, it was the oil dispersing chemicals spread around the ship to counteract an oil spillage.

On July 20 there was a spillage of oil into the water on the starboard side of the No. 1 tanks, that is, between the starboard side and the pier. After lowering the bow, the oil stopped coming out.

Merritt then consulted a company specializing in oil spill dispersion, so as to avoid complaints of water pollution by the Coast Guard or others. Under supervision of this company, a chemical "oil spill disperser", an emulsifier, was sprayed on the oil covered water from a tug. This was done between 1900 and 2130 on July 21 and between 1300 and 1845 on July 22. In the same periods, a high pressure stream of water was applied after the chemical had been sprayed; this was to agitate the mixture to hasten emulsification and dispersion.

At 1015 on July 22, ballast water was pumped into center tank 7; at 1300 on July 22, ballast water was pumped into center tank 9; for a "few hours" before 2245 on July 22, ballast water was pumped into port tanks 5 and 6; and at 1245 on July 23, ballast water was pumped into port tank 5. This was done to steady the ship.

The contention is that, if it be found that an emulsifier was introduced from the ship into shore tanks 5801, 3815 and 3816, then it should be found that this emulsifier was the "oil spill disperser" drawn up with the ballast water and put into center tanks 7 and 9 and port tanks 5 and 6.

It is true that material from port tanks 5 and 6 was discharged to shore tank 5801 between 1440 on July 24 and 0600 on July 25. It is also true that material from center tanks 7 and 9 was discharged to shore tanks 5801 or 3815 or 3816, or to all three, between 1200 on July 27 and 1300 on July 28.

It cannot be found, however, that any significant quantity of the "oil spill disperser" was drawn into the ship with the ballast water.

The oil was spilled from the bow of the ship, some 40 feet out from the bulkhead. According to Zickl, the oil stayed up near the bow; there is some evidence that on July 22 there was oil off the end of the pier. However, the chemical was sprayed primarily, if not entirely, between the bulkhead and the bow of the Alkaid.

In any event, the ballast water is drawn up by a suction pump through a sea cock below the engine room, about 24 feet below the surface of the water.

While the Alkaid was at the Terminal pier, her stern extended about a hundred feet into the Kill Van Kull, which had a current of about 2⅓ miles per hour. The sea cock would be near the vessel's stern.

The evidence considered as a whole establishes that it was not possible to draw with the ballast water enough "oil spill disperser" to cause the emulsification of the material in shore tanks 5801, 3815 and 3816.

## E. Attempts to Separate the Water From the Emulsified Mixture; Failure of These Attempts

According to commercial specifications for oil, there can be no more than 1% of water.

The normal treatment at Terminal to "dry out" a mixture of oil and water was simply to let the water drop to the bottom from where it was drained off through a valve. There were steam coils in each tank and by heating the oil it was made thinner and the water dropped down faster; sometimes air was applied to agitate the hot oil to hasten the water drop.

Until the experience with the mixture from the Alkaid, there had never been an instance where Terminal did not succeed by use of its normal treatment to bring the water content of oil to 1 or less. Normal treatment failed, however, with the Alkaid cargo in tanks 5801, 3815, 3816; on August 9, the water con-

tent of the oil at the top of tank 5801 was 9%, of tank 3815 was 8%, and of tank 3816 was 38%.

On August 19, all material from tanks 3815 and 3816 was transferred to tank 5801. This was to consolidate and had no other effect.

Oilco then consulted a company which for fifty years had been treating oil products, specializing in "de-emulsifiers", that is, materials to introduce into an oil mixture to cause the water to drop out. This company tested the Alkaid mixtures, found it very difficult to break the emulsion, but recommended a trial of one of their materials. Sometime in late August, Terminal used the recommended material; it did cause more water to drop out but not enough. On September 24, the water content was still about 4% and it was plain that the water content could not be brought down to specifications.

■ The suggestion that plaintiff was in some way negligent in its attempts to treat the mixture is without merit. Plaintiff consulted a company with fifty years of experience in the field; there is no evidence that the company was incompetent nor that, if so, its incompetency was notorious. Indeed, there is no evidence that the company consulted did not act with reasonable skill.

■ The suggestion that plaintiff was in some way negligent in transferring good material from tanks 3815 and 3816 to tank 5801 is equally without merit because, as already noted, the material in tanks 3815 and 3816 was not good.

The contents of tank 5801 (to which had been transferred the contents of tanks 3815 and 3816) had to be sold at a price below that for oil with a water content of 1% or less, this to the damage of Oilco.

■ The excess water content of the oil in question was caused by the introduction from the ship into shore tanks 5801, 3815 and 3816 of cleaning slop containing an emulsifier.

### F. Liability of the Ship, Her Owner, and Merritt

■ The facts establish that there was negligence of the shipowner in the discharge of the cargo at Bayonne. The owner directed that tank cleaning proceed before the cargo had been discharged, a thing which should never be done. Representatives of the owner were at the ship every day and knew how the tanks were being cleaned. The owner had a duty to see to it that the tank cleaning did not cause emulsification of the cargo oil. The owner did not do this.

■ The facts establish that there was negligence of Merritt in the discharge of the cargo at Bayonne. Merritt should not have permitted tank cleaning to commence before the discharge had been completed and certainly should never have pumped cleaning slop with an emulsifier into shore tanks containing cargo oil.

■ This appears to be an appropriate case for application of the admiralty rule of divided damages, that is, that where two parties are jointly responsible for property damage, each is primarily responsible for one-half of the damages. If plaintiff cannot recover from one, the other must then respond in full. The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91 (1882); Pennsylvania R.R. Co. v. The Beatrice, 275 F.2d 209 (2d Cir. 1960); Crain Brothers Inc. v. Wieman and Ward Co., 223 F.2d 256 (3d Cir. 1955); Smith v. Nicholson Transit Co., 39 F.Supp. 795 (W.D.N.Y. 1941), 3 Benedict on Admiralty § 416 (1940).

It being hereby expressly determined that there is no just reason for delay (Fed.R.Civ.P. 54(b)), the clerk is directed to enter final judgment in favor of defendants M/S Alkaid and Alvion Steamship Corporation on the claim contained in the "first cause of action" set forth at pages 1 through 5 of the com-

plaint, as amended, and the Clerk is directed to enter final judgment in favor of defendant Clyde Valley on the claim contained in the "cause of action" set forth at pages 5 through 9 of the complaint, as amended.

The parties concerned are directed to settle an interlocutory judgment (decree) in accordance with this opinion on the claims contained in the "further cause of action" set forth at pages 9 through 12 of the complaint, as amended, and set forth in the petition of Alvion Steamship Corporation against Merritt-Chapman & Scott Corporation.

So ordered.